

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-29-2003

# Estate Robert Smith v. Marasco

Precedential or Non-Precedential: Precedential

Docket 02-1437

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Estate Robert Smith v. Marasco" (2003). *2003 Decisions.* Paper 812.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/812

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 29, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1437

ESTATE OF ROBERT CECIL SMITH;
PAULINE SMITH, INDIVIDUALLY AND
AS ADMINISTRATOR OF THE ESTATE
OF ROBERT C. SMITH;
DANA SMITH; WANDA SMITH

v.

TROOPER JAMES MARASCO; TROOPER NICHOLAS
SCIANNA; TROOPER THOMAS WEAVER; TROOPER
ANDREW L. WENGER; CAPTAIN MICHAEL J.
MARCANTINO; LIEUTENANT BERRY REED; LIEUTENANT
EDWARDS; LIEUTENANT SCHAEFFER; LIEUTENANT
SNYDER; ROBERT JOHNSON; DANTE ORLANDI,
CORPORAL; THOMAS GREGORY HALL, CORPORAL;
TEDESCUNG L. BANDY, CORPORAL; BARRY L. BRINSER,
TROOPER; GREGORY BROADDUS, TROOPER;
CARBONELL, TROOPER; COLON, CORPORAL; JOHN R.
COMERER, JR., CORPORAL; GLENN C. DOMAN,
CORPORAL; JOHN EDWARDS, TROOPER; WAYNE S.
ELSER, CORPORAL; FRANK L. FETTEROLF,
LIEUTENANT; DAVID FRISK, CORPORAL; GILLISON,
CORPORAL; JAMES A. HAMILL, CORPORAL; MARTIN L.
HENRY, III, CORPORAL; JOSEPH KALIS, TROOPER; A. J.
KRAWCZEL, CORPORAL; WILLIAM J. MCCLURE,
TROOPER; THOMAS MCDANIEL, SERGEANT; SHAWN
MELL, TROOPER; ARTHUR MOSS, JR., TROOPER;
WILLIAM MOYER, TROOPER; ED MURPHY, TROOPER;

KEVIN REICHERT, CORPORAL; CHARLES RODGERS,
SERGEANT; MERVIN RODRIQUEZ, CORPORAL; THOMAS
RODRIQUEZ, TROOPER; KEITH A. STONE, TROOPER;
GREGORY STUMPO, TROOPER; DOMINIC G. VISCONTI,
TROOPER; WILLIAM WHITE, CORPORAL; JOSEPH
WILSON, CORPORAL; GREGORY WIRTH, TROOPER;
MICHAEL WITMER, CORPORAL; KENNETH YODER,
CORPORAL; JOHN DOE #1-25, WHOSE NAMES ARE
CURRENTLY UNKNOWN

Estate of Robert Cecil Smith;
Pauline Smith; Dana Smith;
Wanda Smith,
          Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. No. 00-CV-5485)
Honorable Franklin S. Van Antwerpen, District Judge

Argued November 7, 2002

BEFORE: MCKEE and GREENBERG, Circuit Judges,
and LIFLAND, District Judge*

(Filed: January 29, 2003)

Jordan B. Yeager (argued)
Boockvar & Yeager
714 Main Street
Bethlehem, PA 18018

Attorneys for Appellants

_____

* Honorable John C. Lifland, Senior Judge of the United States District
Court for the District of New Jersey, sitting by designation.

2

D. Michael Fisher
Attorney General
J. Bart DeLone (argued)
Senior Deputy Attorney General
Calvin R. Koons
Senior Deputy Attorney General
John G. Knorr, III
Chief Deputy Attorney General
Chief, Appellate Litigation Section
Office of Attorney General
15th Fl., Strawberry Square
Appellate Litigation Section
Harrisburg, PA 17120

Attorneys for Appellees

OPINION OF THE COURT

GREENBERG, Circuit Judge:

This matter comes on before this court on an appeal by
the plaintiffs, the Estate of Robert Smith, Pauline Smith,
Dana Smith, and Wanda Smith, to whom we refer
collectively as the "Smiths," from the district court's order
entered January 14, 2002, granting summary judgment in
favor of the defendants, 46 specifically named and 25 John
Doe employees of the Pennsylvania State Police. The Smiths
also appeal from the district court's orders of September
17, 2001, October 12, 2001, November 15, 2001, and
November 30, 2001, to the extent that they denied their
requests to take additional depositions and to extend the
time for discovery. For the reasons stated herein, we will
affirm in part and reverse in part the district court's order
granting summary judgment and will affirm its discovery
orders without prejudice to the Smiths seeking to reopen
discovery on the remand we are ordering.

I. BACKGROUND

Decedent Robert Smith, a former police officer and Vietnam veteran, suffered from various medical problems, including Post-Traumatic Stress Disorder ("PTSD") and

coronary heart disease. Several members of the state police were familiar with Smith, largely as a result of ongoing problems between Smith and his neighbor, Michael Shafer. Prior to the events giving rise to this litigation members of Troop L of the state police had investigated a number of complaints Shafer and Smith had lodged against each other. Smith also had complained numerous times about the conduct of Troop L members, and the state police at one point had charged Smith with making false reports to law enforcement and harassment. The Smiths allege that through these contacts the state police came to know that Smith was in fragile physical and mental health, had a major heart condition, had undergone knee replacement surgery, suffered from hypertension, recently had been hospitalized, and was required to be free from stressful situations and to take medication. Several troopers stated in their depositions, and police event logs confirm, that certain troopers were aware that Smith suffered from PTSD and experienced flashbacks.

The events directly resulting in this litigation started on July 10, 1999, when, in response to a complaint by Shafer, Troopers James Marasco and Nicholas Scianna of Troop L went to Smith's residence at approximately 10:30 p.m.1 Marasco responded to Shafer's complaint even though Smith's residence was outside his assigned geographic patrol area. The troopers did not have an arrest warrant or a search warrant. In an attempt to contact Smith, they repeatedly knocked on his door, but he did not respond. They then called the barracks and spoke to Corporal Mervin Rodriguez ("M. Rodriguez") who advised them to have the residence telephoned and to leave if there was no answer. The call was made but was not answered. Marasco and Scianna, however, did not leave, but instead went to the back of the house searching for Smith.2

_____

1. There are contradictions in the record as to the nature of Shafer's complaint. One account suggests that officers went to Smith's residence to investigate Shafer's complaint that his lights had been shot out, while written reports suggest that they went there to investigate a complaint that a light from Smith's property was shining on Shafer's property.

2. The parties dispute whether the troopers proceeded to the back of the house while the call was being made to Smith's residence or after learning that no one answered the call.

Scianna testified that while in the back of the house he observed a small red light in a window and thought that

Smith might be videotaping the officers. Marasco testified that he saw the light on Scianna's body, and written reports state that the troopers believed that Smith was directing a laser-sighted firearm at Scianna.3 The Smiths dispute this account, noting that the troopers never saw a firearm. Moreover, the Smiths point to contradictory statements concerning where on Scianna's body they allegedly saw the red light, the location of the officers when they first saw the light, and whether the light was emanating from Smith's or Shafer's home. In any event, the officers retreated and called for back-up assistance. M. Rodriguez and Trooper Thomas Rodriguez ("T. Rodriguez") responded and unsuccessfully attempted to communicate with Smith over a police vehicle's public address system and by telephone. M. Rodriguez then called state police Lieutenant Fetterolf to request assistance from the state police's Special Emergency Response Team ("SERT"). Fetterolf agreed and contacted Corporal Hall of SERT, who, with Captain Torkar, activated SERT.

Fetterolf testified that at the time he agreed to activate SERT, he considered the scenario to be a "barricaded gunman" situation. He also testified, however, that the circumstances did not lead him to believe that a gun might be involved, or even that someone was barricaded in Smith's home. Hall testified that SERT should not have been activated unless officers had prepared or were in the process of preparing a warrant, or if there were exigent circumstances. Nevertheless the state police activated SERT before they made the decision to obtain a warrant even though, in Hall's opinion, exigent circumstances did not exist.

Before SERT arrived, several officers began to establish a perimeter around Smith's residence. M. Rodriguez testified that at some point he and T. Rodriguez saw an individual they believed to be Smith walk from the residence to a shed in the backyard. The individual did not respond to their calls and they did not identify him positively as Smith.

---

3. There was extensive deposition testimony in this case.

5

SERT responded with a negotiation team and a tactical team. It appears that at least 30 SERT members wearing riot gear and camouflage and armed with various weapons were present. Sharpshooters targeted firearms at the house, a helicopter hovered overhead, and the state police would not allow anyone, even family members, to come or go to the premises without police permission. SERT unsuccessfully attempted to contact Smith by telephone and over the PA system. Smith, however, did contact his daughter Dana on the telephone, telling her that there were state troopers outside his house. Dana later advised the state police Personal Communications Officer ("PCO") of this call.

In the early morning of July 11, 1999, Trooper Weaver, the on-duty criminal investigator, filed criminal charges of aggravated assault, simple assault, and recklessly endangering a person against Smith and obtained a warrant for his arrest. Moreover, Trooper Andrew Wenger obtained a search warrant for Smith's premises. According to the Smiths, SERT rejected offers from family, friends, and neighbors to attempt to communicate with Smith and prevented Chris Zwicky, a neighbor familiar with the woods near Smith's house, from searching for Smith. They also chose not to record a message from anyone close to Smith, despite having technology to do so, and decided not to utilize Dana Smith as a mediator, despite her having received a call from Smith asking her to do so. Finally, SERT rejected the use of a psychologist.

SERT then entered and cleared the house and the shed in the backyard using rocks, tear gas, and "flash bang" distraction devices. Nevertheless the police did not find anyone in either structure. They did, however, recover eight weapons including handguns with scopes, though none had a laser sight. The officers also found a video cassette and a camcorder, which they seized after obtaining a warrant, as well as Smith's wallet, identification, cash, credit cards, keys, false teeth and medication he was required to take by reason of recently having had triple bypass surgery. After learning that Smith had a hunting hideout in the woods, SERT searched the wooded area adjacent to Smith's residence with Zwicky's aid.[4] Having failed to locate Smith,

_____

4. The Smiths proffer evidence suggesting that a number of SERT members already had left the scene and were called back only when

the officers called off the search and, around midday on July 11, 1999, left the scene.

On July 12, 1999, the complaint against Smith was withdrawn. That same day, Smith's brother filed a missing persons report because Smith had not returned home. The parties dispute the nature of the search effort over the next days. The defendants presented records indicating that Marasco and Corporal Elser conducted a foot search for Smith on July 14, 1999; that Corporal Schell conducted an aerial search in a state police helicopter and interviewed neighbors; that Wenger inquired into Smith's cell phone records to determine if the phone had been used; that, on July 15, 1999, Elser contacted the Lebanon Veterans Administration Hospital in an effort to locate Smith; and that, on July 16, 1999, members of the state police searched the wooded area behind the Smith residence, describing that area as impenetrable, though they eventually found Smith's cell phone.

On the other hand, the Smiths proffer evidence indicating that the police did not treat Smith like an armed fugitive or missing person by, for example, conducting a house-to-

house inquiry or a sustained search, trying to contact family or friends, or checking with local hospitals or commercial establishments. They also proffer expert testimony suggesting that the officers' conduct in the days following the incident, as well as during the incident itself, fell below accepted standards of police practice. They note that, according to police records, the July 14, 1999 search lasted only 35 minutes and extended only 4 to 5 feet into the woods, that the police failed to use any maps, diagrams, photos, or compass during their July 16, 1999 search, and that the police rejected requests by family and friends to use available search dogs.

The Smiths also suggest that police actually located Smith's cell phone earlier than July 16, 1999, pointing to

_____

Zwicky, who was confident that he could find Smith, insisted that they search for Smith. The Smiths also suggest that SERT failed to use a grid or to map the area in any way, and that SERT simply gave up on the search after checking Smith's hunting hideout.

7

Smith's brother's testimony to the effect that Weaver mentioned finding the phone on July 13, 1999. They assert that the police hid this discovery, as well as the discovery of Smith's body at some point prior to July 18, 1999. They proffer evidence suggesting that police on July 11, 1999, were in the part of the woods where Smith's body later was found; that the police helicopter, which was equipped with heat sensors designed to locate bodies, hovered above this spot for an extended period of time; that police were searching that location at the same time Smith's cell phone received an incoming call; and that clippings of brush cut back by police were found within ten to 15 yards of Smith's body. Furthermore, they submit that if the police did not recover the phone until July 16, 1999, there is no way they could have failed to smell the odor of Smith's decomposing corpse, which later was found only ten to 15 yards from the place where they recovered the phone. Id. Forensic pathologist Sanford Edberg stated in his report that a person should have been able to notice the smell and the buzz of flies within one day from a distance of ten to 20 yards.

On July 18, 1999, Smith's friend, Alan Achey, found Smith's severely decomposed body in a wooded area approximately 200 yards from Smith's home. Edberg estimated that Smith died sometime between 11:50 a.m. and 11 p.m. on July 11, 1999, and concluded that, given Smith's medical condition, the stress of the incident probably led to a fatal heart attack.

The Smiths brought this action in the district court pursuant to 42 U.S.C. S 1983, alleging that the defendants violated Smith's rights under the First, Fourth, and Fourteenth Amendments. The Smiths also included wrongful death, survival and intentional infliction of

emotional distress claims under state law. After extensive discovery proceedings, the defendants moved for summary judgment on July 27, 2001, both on the merits and on the basis of qualified immunity. On September 17, 2001, the district court granted the Smiths' motion to extend discovery pursuant to Fed. R. Civ. P. 56(f), but on October 12, 2001, the district court denied the Smiths' appeal from an order of the magistrate judge denying their request to

take more than ten depositions, a limitation the magistrate judge earlier had imposed. On November 15, 2001, the district court denied the Smiths' renewed motion to take additional depositions and for an extension of time for discovery and then, on November 30, 2001, denied the Smiths' renewed Rule 56(f) motion. On January 14, 2001, the district court again denied the Smiths' renewed motions to take additional depositions and to extend discovery, granted the defendants' motion for summary judgment on all section 1983 claims on the merits mentioning, but not predicating its decision on, the qualified immunity arguments. The court dismissed the state law claims without prejudice. This appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

### A. JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. SS 1331, 1343, and 1367 in that the complaint alleged federal civil rights claims under 42 U.S.C. S 1983 and supplemental state law claims. On January 14, 2002, the district court entered final judgment in the case, and on February 8, 2002, the Smiths timely filed their notice of appeal. We therefore have jurisdiction pursuant to 28 U.S.C. S 1291.

### B. STANDARD OF REVIEW

We exercise de novo review of the district court's grant of summary judgment. See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1999). We review questions concerning the scope of discovery for abuse of discretion. See Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000).

## III. DISCUSSION

### A. SUMMARY JUDGMENT ORDER

42 U.S.C. S 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States

or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Notwithstanding its broad language section 1983 does not create substantive rights; rather it merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws. Kneipp, 95 F.3d at 1204. Thus, the initial question in a section 1983 action is " 'whether the plaintiff has alleged a deprivation of a constitutional right at all.' " Donahue v. Gavin, 280 F.3d 371, 378 (3d Cir. 2002) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 118 S. Ct. 1708, 1714 n.5 (1998)).[5]

The Smiths alleged that the defendants violated Smith's rights to substantive due process under the Fourteenth Amendment both under the "state-created danger" doctrine and by engaging in a cover-up. They further alleged that the defendants violated Smith's rights to be free from the use of excessive force, unreasonable searches and seizures, and malicious prosecution under the Fourth Amendment. Finally, the Smiths alleged that the defendants violated Smith's rights under the First Amendment by retaliating against him for complaints he had made concerning prior contacts with the state police officers. In a comprehensive opinion the district court found that, as a matter of law, the Smiths could not show that Smith had suffered any deprivation of a constitutional right and thus the court entered summary judgment in favor of the defendants.

1. Substantive Due Process Claims

The Smiths advance two substantive due process

_____

5. While Donahue was concerned with an appeal in a case in which the defendants had obtained summary judgment on the basis of absolute or qualified immunity, obviously we should make the same inquiry even though the district court did not decide the case on the basis of the defendants having qualified immunity. We note, however, that the defendants have advanced their claim to qualified immunity on this appeal as an alternative basis to affirm the order for summary judgment.

10

theories: (1) state-created danger; and (2) cover-up and mishandling of Smith's corpse.

    a. State-Created Danger Doctrine

In Kneipp v. Tedder, we recognized the state-created danger theory of section 1983 liability, holding that a plaintiff must prove four elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3)

there existed some relationship between the state and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur. Kneipp, 95 F.3d at 1208 (citing Mark v. Borough of Hatboro, 51 F.3d 1137, 1152 (3d Cir. 1995)). The fourth element's reference to a "third party's crime" arises from the doctrine's origin as an exception to the general rule that the state does not have a general affirmative obligation to protect its citizens from the violent acts of private individuals. See Kneipp , 95 F.3d at 1208. The courts, however, have not limited the doctrine to cases where third parties caused the harm as Kneipp itself demonstrates. In that case, a police officer stopped a visibly intoxicated husband and wife, Joseph and Samantha Kneipp, for allegedly causing a disturbance. Kneipp, 95 F.3d at 1201. When the officer allowed Joseph to go home to relieve the babysitter watching his son, Joseph assumed that the police would take Samantha, whose blood alcohol level later was estimated at .25%, either to the hospital or to the police station. Id. at 1201-02 & n.4. The officer, however, eventually sent Samantha home alone, and she was found later that night unconscious at the bottom of an embankment next to a parking lot across the street from the Kneipps' home. Id. As a result of her exposure to the cold, she suffered hypothermia, which caused a condition known as anoxia, which in turn resulted in permanent brain damage impairing many basic body functions. Id. The Kneipps instituted a district court action against the police officers who obtained a summary judgment. The Kneipps appealed and we reversed and remanded the case for trial. Id. at 1213-14.

Although Kneipp provides the framework for evaluating a state-created danger claim, recent cases have refined

11

certain elements of the four-part test we set forth above. First, in County of Sacramento v. Lewis, the Supreme Court held that an officer's "deliberate indifference" or "reckless disregard" alone would not lead to liability for violating substantive due process rights in a pursuit case; liability attaches only to conduct that "shocks the conscience." 523 U.S. at 845-47, 118 S.Ct. at 1716-17. In Miller v. City of Philadelphia, building on County of Sacramento v. Lewis and other Supreme Court cases, we suggested that the "shocks the conscience" standard was applicable to all substantive due process cases. Miller, 174 F.3d 368, 374-75 (3d Cir. 1999). Second, in Morse v. Lower Merion School District, we refined the third and fourth prongs of the state-created danger test. Morse, 132 F.3d 902 (3d Cir. 1997). In Morse we held that the third requirement--a relationship between the state and the plaintiff--ultimately depends on whether the plaintiff was a foreseeable victim, either individually or as part of a discrete class of foreseeable victims. Id. at 914. Furthermore, we clarified that, with respect to the fourth element--creating the opportunity for harm--"the dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous

position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission." Id. at 915.

Here, analyzing the first element--foreseeable and fairly direct harm--the district court concluded that the officers, even with knowledge of Smith's poor health, as a matter of law could not have foreseen that he would flee from the house and as a consequence suffer a heart attack in the woods. App. at 50. But we believe that this conclusion ignores evidence that, if believed, could lead a jury to conclude that Smith suffered foreseeable harm. To start with, the official incident report states that it was the officers' purpose to make Smith appear, and once officers believed they had seen Smith moving from the house to the shed, Marasco and M. Rodriguez "moved into a position . . . to block [Smith's] return to the residence if attempted." Id. at 548. Moreover, as noted above, at least some of the officers on the scene were aware of Smiths' mental and physical condition, including his tendency to have flashbacks to his service in Vietnam under stressful

12

situations, and, once the search of the residence was conducted, at least some officers were aware that Smith had fled without his necessary medication. In this regard the Smiths' pathology expert stated that "a person such as Smith, suffering from post traumatic stress disorder would have been greatly alarmed by the arrival of police with a helicopter and the assault on his residence with bright lights, breaking windows with rocks, flash bang distraction devices and tear gas, all of which caused him to flee the house and hide in the woods where the stress of these police-induced actions caused a fatal heart attack." Id. at 2378-79. The Smiths also proffer the expert testimony of Dr. McCauley, a police practices expert, who opined that a "reasonably trained police officer would have reasonably concluded that injury or death to Smith was a reasonably foreseeable consequence of Smith's mental and medical conditions, especially knowing he was without his medication." Id. at 2343.

When we consider this evidence and draw all reasonable inferences in the Smiths' favor, we conclude that the district court erred in determining that a jury could not find that Smith's harm was foreseeable. As in Kneipp , a jury could find that "[t]he affirmative acts of the police officers here created a dangerous situation, requiring that they take additional measures to ensure [the plaintiff 's] safety," especially where police "intervened to cut off[the plaintiff 's] private source of protection." Kneipp, 95 F.3d at 1210.

This case is not like Morse, in which a daycare operator was not liable for leaving the rear entrance of a school open, thereby allowing an individual with a history of mental illness to enter and kill a teacher. In Morse, we held that harm to the teacher was not foreseeable, largely because the defendants were unaware that any mentally

deranged person might be waiting outside the building.
Morse, 132 F.3d at 910. We realize that the number of
officers aware of Smith's mental and physical condition and
failure to bring proper medication when he fled is unclear.
Nevertheless, the Smiths have presented sufficient evidence
to allow a jury to find that at least some of the officers were
aware of Smith's condition and should have foreseen that
he might flee and suffer adverse medical consequences
when SERT was activated.

13

With respect to the second element in a state-created
danger claim--conscience-shocking conduct--the district
court found that neither the decision to confront an
individual suffering from PTSD with officers dressed in
fatigues, a helicopter, and weapons nor the officers' alleged
failure to conduct a fully thorough search shocked the
conscience. App. at 52-54. The district court failed to
recognize, however, that, as we noted in Miller , the precise
degree of wrongfulness required to reach the conscience-
shocking level depends on the circumstances of a particular
case. Miller, 174 F.3d at 375. As we indicated in United
Artists Theatre Circuit, Inc. v. Township of Warrington, No.
01-3533, slip op. at 11, 2003 WL 115585, at * (3d Cir. Jan.
14, 2003), since County of Sacramento v. Lewis , "our cases
have repeatedly acknowledged . . . that the meaning of [the
shocks the conscience] standard varies depending on the
factual context." Cf. Brown v. Commonwealth of Pa. Dep't of
Health, No. 01-3234, slip op. at 11, 2003 WL 148919, at *6
(3d Cir. Jan. 22, 2003) (shocks the conscience standard
"applies to the actions of emergency medical personnel").
For example, in the custodial situation of a prison, where
forethought about an inmate's welfare is possible,
deliberate indifference to a prisoner's medical needs may be
sufficiently shocking, while "[a] much higher fault standard
is proper when a government official is acting
instantaneously and making pressured decisions without
the ability to fully consider the risks." Miller, 174 F.3d at
375.

In cases involving a "hyperpressurized environment,"
such as a prison riot or a high-speed chase, liability
normally will attach only where a "purpose to cause harm"
is demonstrated. Id. In Miller itself, we held that a social
worker acting to separate a parent and child was operating
in an environment somewhere between the prison
riot/high-speed chase scenario and the custodial situation,
and that conscience-shocking conduct could be established
by a showing of more than negligence or deliberate
indifference, but less than a purpose to cause harm. Id. The
plaintiffs in that case therefore had to show "a level of gross
negligence or arbitrariness that indeed 'shocks the
conscience.' " Id. at 375-76.

14

In this case, the officers were confronted with what

Fetterolf described as a "barricaded gunman" situation. This case, however, did not involve the "hyperpressurized environment" of an in-progress prison riot or a high-speed chase. See Miller, 174 F.3d at 375. Indeed, the official incident report shows that at least one hour passed between the time Marasco and Scianna approached Smith's residence and the time Fetterolf authorized a request to activate SERT. During that time no shots were fired and the officers did not see a firearm brandished. Moreover, at least after the police arrived at the Smith residence, the police had no reason to be concerned about the safety of third parties. Thus, this case does not involve a "hyperpressurized environment" such that the Smiths to recover would have to demonstrate that the defendants had an actual purpose to cause harm.

At the same time, however, this case is not one in which the police had "the luxury of proceeding in a deliberate fashion, as prison medical officials can." Miller, 174 F.3d at 375. Because the urgency and timing involved in this case is more like the situation in Miller, the Smiths here must demonstrate "a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" Id. at 375-76. We think based on our reading of the precedents in this elusive area of the law that, except in those cases involving either true split-second decisions or, on the other end of the spectrum, those in which officials have the luxury of relaxed deliberation, an official's conduct may create state-created danger liability if it exhibits a level of gross negligence or arbitrariness that shocks the conscience.

The Smiths have produced sufficient evidence to allow a reasonable jury to conclude that the officers' conduct both with regard to activating SERT and with regard to searching of the woods shocked the conscience. In addition to the evidence already discussed, the Smiths proffer the expert opinion of Dr. McCauley, who suggests that the officers' conduct fell significantly below accepted professional standards for dealing with emotionally disturbed persons, stating in particular that "[h]ad the officers acted in accordance with accepted police training and practices in dealing with [emotionally disturbed persons], it is more

15

likely than not that the harm/death suffered by[Smith] would have been avoided," and that police inappropriately assumed "a rigid enforcement role, which aggravated and escalated the tenor of the situation." J.A. at 2337.

Furthermore, the Smiths have amassed evidence calling into question the adequacy of the search efforts and the motives behind the numerous decisions that cut Smith off from private sources of potential aid. Although it is true that the officers in this case, unlike the officer in Kneipp, did not, as the district court noted, completely abandon the situation or totally cut off all outside help, we are unwilling to adopt the position that their efforts to mitigate a danger that they allegedly created necessarily insulate them from

liability. If the Smiths can prove that the officers' efforts were so minimal as to constitute gross negligence or arbitrariness that shocks the conscience, then the second prong of the Kneipp test will be met. In this case, the district court should not have determined as a matter of law that the officers' efforts were adequate where questions of fact remain as to what they could have and should have done to confront a known emotionally disturbed person and to conduct a proper search for that person after he was flushed from his home.

It appears to be undisputed that the third prong of the Kneipp state created danger test--a relationship between the plaintiff and the state--has been met here. In any event, as in Kneipp, the defendants here,"exercising [their] powers as . . . police officer[s] . . . . exerted sufficient control" over Smith to meet the relationship requirement. See Kneipp, 95 F.3d at 1209.

To meet the fourth prong of the test the Smiths must demonstrate that the officers "used their authority to create an opportunity that otherwise would not have existed" for harm to befall Smith. See Kneipp, 95 F.3d at 1209. A reasonable jury could conclude that the decisions to activate SERT against someone in Smith's physical and mental condition, flush Smith from his home, confine him to the densely wooded area, block his route of return, reject the use of search dogs, not allow family or friends to communicate with him over the PA system, and search only a short distance into the woods after observing that Smith

16

was without his wallet, identification, cash, credit cards, keys, and medication, among other actions, created just such an opportunity.6 As in Kneipp, it is "conceivable that, but for the intervention of the police," which arguably put the victim there in a "worse position" and increased her risk of danger, Smith would have returned home on his own or with the encouragement of his family or friends. Id. at 1209.

The district court found that this element could not be proven because the officers employed legitimate tactics. App. at 53. This conclusion both usurps the role of the jury as the Smiths have presented substantial evidence calling into question the officers' motives and tactics and misapplies the fourth prong of the Kneipp test, which asks only whether, but for the defendants' actions, the plaintiff would have been in a less harmful position. Evidence of the legitimacy of the tactics used by the troopers may be relevant to the "shocks the conscience" prong, but it says little about whether such tactics increased the risk to Smith. The Smiths have produced sufficient evidence to allow a reasonable jury to find that the troopers placed Smith in a foreseeably dangerous position.

Inasmuch as we have concluded that a reasonable jury could find that there was a constitutional violation in this

case, we turn to the question of whether the defendants knew or should have known that their actions were clearly unlawful as they advanced a qualified immunity defense in the district court and do so on this appeal. Officials are entitled to immunity unless "the law clearly proscribed the actions" they took. Mitchell v. Forthsythe , 472 U.S. 511, 528, 105 S.Ct. 2806, 2816 (1985). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

---

6. We are not suggesting that a jury would have to reach that result. Indeed, we certainly understand why the police wanted to keep third parties away from Smith's premises as the police could have believed that their safety would have been jeopardized by their intervention. Obviously, we are not suggesting that evidence along these lines would not be admissible at trial.

17

rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).

In considering the qualified immunity defense we first observe that we delineated the elements of a state-created danger claim in Mark v. Borough of Hatboro, 51 F.3d at 1152-53, and more clearly adopted the theory and defined its contours the following year in Kneipp. Thus, the right at issue in this case was clearly established at the time the incident occurred. A plaintiff, however, must show more to survive a motion for summary judgment predicated on a qualified immunity defense. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987). Moreover, in a multi-defendant case the district court should "analyze the specific conduct of each . . . Defendant with respect to the constitutional right at issue." Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) (emphasis in original).

Inasmuch as the district court did not reach the qualified immunity question, and in recognition that the record is unclear as to the relationship between each defendant's specific conduct and the rights at issue, we find it appropriate to remand the qualified immunity issue to allow the district court to make the necessary factual determinations with respect to qualified immunity in the first instance. See id. at 122-23 ("[C]rucial to the resolution of any assertion of qualified immunity is a careful examination of the record (preferably by the district court) to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff). . . . We think that the district court . . . is in a far better position than we are to review the record for evidence as to the specific conduct of each of the . . . Defendants."); see

also Brown v. United States, 851 F.2d 615, 620 (3d Cir. 1988) ("[A]lthough it is within our power to do so, it would be inappropriate for us to decide this question on appeal, even if the record provided a sufficient basis for its resolution.").

18

### b. Alleged Cover-Up and Mishandling of Smith's Corpse

Cover-ups that prevent a person who has been wronged from vindicating his rights violate the right of access to the courts protected by the substantive due process clause. Swekel v. City of River Rouge, 119 F.3d 1259, 1261-64 (6th Cir. 1997); Bell v. City of Milwaukee, 746 F.2d 1205, 1253-58 (7th Cir. 1984); Ryland v. Shapiro, 708 F.2d 967, 97-75 (5th Cir. 1983); see also Wolff v. McDonnell, 418 U.S. 539, 579, 94 S.Ct. 2963, 2986 (1974) ("The right of access to the courts . . . is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights."). "[I]f state officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that concealment and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled, they may have committed a constitutional violation." Swekel, 119 F.3d at 1262-63 (citing Ryland, 708 F.2d at 969-70).

Notwithstanding the broad formulation of the principle that a state officer's cover-up may create constitutional liability, in practice the courts have been cautious in allowing liability to be imposed on that basis. Thus, a plaintiff typically cannot recover for any cover-ups or discovery abuses after an action has been filed inasmuch as the trial court can deal with such situations in the ongoing action. In fact, if alleged cover-ups in the course of litigation are regarded as actionable under section 1983 it is foreseeable that an initial civil rights action, or indeed any action against a state or local government or its officers, will be only the first in a series of such cases. Thus, only prefiling conduct that either prevents a plaintiff from filing suit or renders the plaintiff 's access to the court ineffective or meaningless constitutes a constitutional violation. Id. at 1261-64; see also Foster v. City of Lake Jackson, 28 F.3d 425, 430 (5th Cir. 1994) (suggesting that the right of access to the courts encompasses "a right to file an action, but not the right to proceed free of discovery abuses after filing").

19

The Smiths point out that the police refused to return Smith's answering machine tapes after they dropped the charges against him and that when they returned the tapes they did not contain any of the officers' voices, despite the

fact that police records show that officers left numerous messages during the incident. They suggest that the defendants either have withheld tapes containing their voices, or altered tapes to erase their voices. Furthermore, the Smiths point to a note in an internal police record referring to concerns about "possible civil litigation" to suggest that the defendants tampered with the tapes for the purpose of impeding the Smiths from pursuing their rights. App. at 561. Finally, the Smiths rely on the evidence summarized above suggesting that the police came into contact with Smith's body earlier than reported and that their refusal to use search dogs prevented a more definitive autopsy by allowing the body to decompose.

Even if the Smiths can prove that the defendants attempted to effectuate a cover-up, they have not made a showing that the defendants' efforts either prevented the Smiths from filing suit or rendered their access to the courts ineffective or meaningless. Nor have the Smiths provided support for their contention that a more complete autopsy could have revealed more helpful information than was obtained from the autopsy conducted which, when coupled with their expert testimony, supplied a basis for a jury to attribute Smith's death to defendants' conduct. Furthermore, the Smiths raised the issue of potentially altered tapes in the district court which thus was in a position to address their concerns.

In any event, the Smiths were able to bring this action and present substantial evidence of central importance to their case. As a result, even assuming that they have proffered sufficient evidence for a jury to conclude that there was a cover-up, the alleged conduct did not prevent them from filing suit or render their access to the courts ineffective or meaningless. Indeed, this very opinion demonstrates that the Smiths have been able to develop the facts in this case quite effectively. Overall, we are satisfied that neither their cover-up and mishandling theories can support a substantive due process claim.

2. First Amendment Retaliation Claim

To prove that the defendants violated Smith's First Amendment rights by retaliating against him for filing complaints, the Smiths must show: (1) that Smith engaged in protected activity; (2) that the government responded with retaliation; and (3) that the protected activity was the cause of the retaliation. See Anderson v. Davila , 125 F.3d 148, 161 (3d Cir. 1997). The district court properly concluded that the Smiths provided insufficient evidence of a causal link to survive summary judgment.

We first consider the timing of the alleged retaliation remembering that "[e]ven if timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."

Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). Thus, in recognition of that principle, we have held that such an inference could be drawn where two days passed between the protected activity and the alleged retaliation, see Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), but not where 19 months had elapsed, see Krouse, 126 F.3d at 503. Smith lodged all his complaints between 1991 and 1998 so that the timing of the alleged retaliatory action, which started on July 10, 1999, is not unusually suggestive of retaliatory motive.

We have recognized, however, that "timing plus other evidence may be an appropriate test where the temporal proximity is not so close as to be 'unduly suggestive.' " Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000). But the Smiths have not offered other evidence in support of their retaliation claim, suggesting merely that, drawing all inferences in their favor, the officers' targeting of Smith on July 10, 1999, and the force with which they acted could convince a reasonable jury of the causal link. This suggestion, however, does not constitute affirmative evidence. Although it is undisputed that a number of the officers were aware of Smith's complaints, there is no evidence to suggest that an intent to retaliate against him caused or contributed to the events of July 10, 1999. In fact, the officers went to Smith's premises on that day in

21

response to a complaint by Shafer rather than on their own initiative.

We also point out that a court in considering a First Amendment retaliation claim against a police officer should be cautious in allowing it to proceed to trial in the face of the officer's summary judgment motion. In this regard we observe that officers should not by reason of potential civil liability be discouraged from intervening when their services are needed by the not surprising circumstance that a claim has been lodged against a person with whom they have had previous adverse dealings. Society may pay a high price if officers do not take action when they should do so. We therefore will affirm the district court's judgment as to this claim.

3. Fourth Amendment Claims

The Smiths predicate their Fourth Amendment argument on four theories: (1) use of excessive force; (2) unreasonable seizure; (3) unreasonable search; (4) malicious prosecution.

        a. The Red Dot and Probable Cause

The Smiths' assertion that there remains a genuine issue of material fact as to whether Marasco and Scianna actually saw a red light and believed that that light might be emanating from a laser-sighted weapon pointed at them by Smith is central to their Fourth Amendment theories.[7] The district court found that the troopers knew that Smith

was mentally unstable and that he possessed guns; that it was undisputed that Scianna observed a red light in the window of the Smith residence and that Marasco saw a red dot appear on Scianna's person; and that the troopers were aware that Shafer once had complained about Smith shooting out his lights. The district court then applied these findings in determining that the officers had an objectively reasonable belief that Smith was engaged in

_____

7. As we interpret the Smiths' argument their contention with respect to a lack of probable cause does not in itself assert a Fourth Amendment claim but is germane to their other Fourth Amendment claims. If we misunderstand their position it does not matter as we are finding that probable cause existed.

criminal activity and that the force they used was a reasonable response to the danger they faced.

The Smiths argue primarily that a reasonable jury could discredit the officers' account of the incident and find that Marasco did not in fact believe that Smith targeted a laser-sighted weapon at Scianna. They note our approval of an opinion by the Court of Appeals for the Ninth Circuit warning that "courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story--the [decedent]--is unable to testify,' " and that the " 'court may not simply accept what may be a selfserving account by the officer. . . . [but] must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably.' " Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999) (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)). Of course, this admonition does not alter the requirement that a party opposing summary judgment must present affirmative evidence--whether direct or circumstantial--to defeat summary judgment, and may not rely simply on the assertion that a reasonable jury could discredit the opponent's account. See Williams v. Borough of W. Chester, 891 F.2d 458, 460-61 (3d Cir. 1989).

"[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995). Although, generally, "the question of probable cause in a section 1983 damage suit is one for the jury," Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998), a district court may conclude "that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding," and may enter summary judgment accordingly. Sherwood v.

Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).

The Smiths have not proffered affirmative evidence raising questions of material fact with regard to the officers' account. First, they rely on various facts allegedly suggesting that Marasco had an improper motive: alleged contradictions in the record as to why the officers went to the scene; the fact that Marasco's decision to respond to a complaint about bright lights was made at 3:00 p.m., when bright lights could not have been a problem; the fact that Marasco was outside of his assigned geographic position; and Marasco's failure to heed his supervisor's directions to leave the premises if Smith did not respond. Improper motive, however, is irrelevant to the question whether the objective facts available to the officers at the time reasonably could have led the officers to conclude that Smith was committing an offense. See Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

The Smiths also point to contradictions concerning where on Scianna's body the troopers purportedly observed the light and whether both officers were in the backyard when Scianna mentioned seeing what he at first took to be a video camera in the window. However, neither of these inconsistencies tends to discredit the essential portion of Marasco's account: that, at some point when the officers were together, he observed what he reasonably took to be a laser sight pointed at Scianna.

Finally, the Smiths suggest that any red light, if the troopers indeed saw one, could not have been emanating from Smith's residence because the troopers at one point stated that the beam was pointed at Scianna's back while he faced the rear of the house. The Smiths further argue that it is undisputed that Shafer was home at the time and that he likely possessed firearms. The record, however, will not support a finding that the light emanated from Shafer's property. Moreover, the officers already had spoken to Shafer and there is no suggestion that they considered him a threat of any magnitude. More importantly, Marasco testified that the red light shone on different parts of Scianna's body as he turned around, so the fact that the light was at some point on Scianna's back and at another

point may have been on his chest or arm is not determinative of the place of the origin of the light. Even if the light came from some other part of Smith's property, the officers, based on their knowledge that Smith possessed firearms, their knowledge of Shafer's complaint that Smith had shot out his lights, and the fact that Smith was not answering their calls despite indications that he was on the property, reasonably concluded that Smith might be

targeting them with a laser-sighted weapon.

In sum, the record establishes that the officers had an objectively reasonable belief that Smith might be in the house, ignoring their attempts to communicate with him and bearing a laser-sighted firearm. The record also establishes that, at some point, Marasco believed that Scianna was being targeted by that firearm. At that point, therefore, the officers had probable cause to seek to arrest Smith.

### b. Excessive Force Claim

Of course, the fact that the defendants had probable cause to arrest Smith does not mean that they could use any amount of force in that process. Rather, they could not use excessive force. "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Abraham, 183 F.3d at 288. Inasmuch as the defendants do not contest that there was a seizure in this case, in considering the excessive force contention the only question on appeal is whether the force used to effect that seizure was reasonable.

The test of reasonableness under the Fourth Amendment is whether, under the totality of the circumstances, "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872 (1989). Thus, if a use of force is objectively unreasonable, an officer's good faith is irrelevant; likewise, if a use of force is objectively reasonable, any bad faith motivation on the officer's part is immaterial. See Abraham, 183 F.3d at 289.

25

Factors to consider in making a determination of reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight, see Graham, 490 U.S. at 396, 109 S.Ct. at 1872, as well as the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time, see Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997). Of course,

> [t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly

> evolving--about the amount of force that is necessary
> in a particular situation.

Graham, 490 U.S. at 396-97, 109 S.Ct. at 1872. Finally, although "reasonableness under the Fourth Amendment should frequently remain a question for the jury," Abraham, 183 F.3d at 290, " 'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances,' " id. (quoting Scott v. Henrich, 39 F.3d at 915).

As already noted, the record establishes that the officers had an objectively reasonable belief that Smith might be targeting them with a laser-sighted firearm. For purposes of the Smiths' excessive force claim, however, the objective reasonableness inquiry does not end here. The ultimate question on review is whether the decision to activate SERT and SERT's subsequent actions were objectively reasonable responses to this situation. The Smiths have proffered sufficient evidence to make this a question appropriate for resolution by a jury.

The district court concluded that the force used in this case was far less extreme than that the police used in Sharrar v. Felsing, in which we affirmed a district court's grant of summary judgment in favor of the defendant officers on an excessive force claim. App. at 35-36. It is true that the officers' conduct here was certainly no more forceful than in Sharrar, where an eight-member SWAT team dressed in black fatigues and carrying shotguns, rifles, and submachine guns was deployed, a police sniper was called in, a perimeter was established, and police, after calling the suspects out of their house, forced the suspects to the ground and repeatedly yelled at them, "[k]eep your fucking head down or I'll blow it the fuck off." Sharrar, 128 F.3d at 815-16. In Sharrar, with respect to the excessive force claim, we concluded: "[w]hile the language and method used to effect the arrests appear to be more akin to the Rambo-type behavior associated with police in overdramatized B movies or TV shows than the police conduct ordinarily expected in a quiet, family seaside town, we are reluctant to establish a precedent that would subject every police arrest of a group of possible violent offenders to compliance with Marquis of Queensberry Rules of fair play." Id. at 822. The district court, seizing on this language, concluded that the less severe conduct in this case was therefore not unreasonable.

The district court erred by failing to take into account another portion of the reasonableness equation, namely, the severity of the threat to which officers were responding, in keeping with the Graham and Sharrar factors.8 In Sharrar, officers were arresting four men and had been advised that at least one of the men had used a gun in a violent episode one to two hours before. Furthermore, there

had been some suggestion that the suspects were involved with drugs, and arrests actually were made. Id. In this case, by contrast, officers were approaching only one man and, unlike in Sharrar, where a violent assault involving a gun was itself the catalyst for the police arriving on the scene, were responding to a minor complaint.

_____

8. Although the district court quoted the factors identified in Sharrar, it failed to consider any of them in its analysis except to note that Smith was known to possess weapons.

We realize that several officers knew of Smith's PTSD or at least considered him unstable, and it generally was believed that Smith possessed firearms. These factors may be seen as tending to support the use of force. Nevertheless, there were a number of other Graham and Sharrar factors suggesting unreasonableness. There was no indication that Smith had been using a gun recently or that Smith ever has used a gun in a violent manner. No arrest was made, and the Smiths have proffered evidence suggesting that an arrest warrant was not even sought until after SERT was activated. Most importantly, there is no indication in the record that Smith had any history of violence of which the officers may have been aware. Finally, unlike in Sharrar, where just over three hours transpired between the victim's 911 call and the arrest of the four suspects, here, according to the incident report, approximately two and one half hours transpired between Shafer's call to the police and the decision to activate SERT, and at least six hours passed between the phone call and initiation of the first "rock assault" on the Smith residence. In fact the police did not finally clear the residence until approximately 7:30 a.m. on July 11, 1999, approximately eight and one-half or nine hours after the call that initiated their activity. A number of the relevant factors therefore cut against a determination that they used reasonable force.

We also point out that the district court does not appear to have considered certain other relevant facts in the light most favorable to the Smiths. For example, the district court summarily concluded that the officers' awareness of Smith's PTSD cuts in favor of reasonableness because, given Smith's history of mental problems and possession of weapons, the officers reasonably would believe that their lives were in danger. The question the district court should have asked, however, was not simply whether the officers reasonably believed their lives were in danger, but whether the activation of SERT and the tactics of that unit were a reasonable response to that belief in the circumstances of this case.

We recognize that a jury could conclude, as the district court apparently did, that this overwhelming show of force was a reasonable response to the threat the officers

perceived. However, a jury should be allowed to consider the testimony of the Smiths' police practices expert, Dr. McCauley, who opined that the police responded unreasonably to a situation involving a known Emotionally Disturbed Person ("EDP"). Likewise, it appears to be significant that Hall, who played a part in the decision to activate SERT, testified that SERT is not activated unless a warrant has been or is in the process of being prepared, or if exigent circumstances exist. Hall did not believe that there were exigent circumstances, and the decision to obtain a warrant appears to have been made after SERT was activated. If SERT activation was unwarranted under SERT's own procedures, that fact is at least probative of unreasonableness.

In sum, the Smiths have proffered evidence sufficient to require that the question of the reasonableness of activating SERT and of SERT's tactics be submitted to a jury. As the Court of Appeals for the Tenth Circuit recently has noted,

> The decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force--force far greater than that normally applied in police encounters with citizens. Indeed, it is the SWAT team's extraordinary and overwhelming show of force that makes 'dynamic entry' a viable law enforcement tactic in dealing with difficult and dangerous situations. . . .
>
> . . . .
>
> The 'SWAT' designation does not grant license to law enforcement officers to abuse suspects or bystanders, or to vent in an unprofessional manner their own pent-up aggression, personal frustration or animosity toward others. If anything, the special circumstances and greater risks that warrant 'dynamic entry' by a SWAT team call for more discipline, control, mindfulness, and restraint on the part of law enforcement, not less. SWAT officers are specially trained and equipped to deal with a variety of difficult situations, including those requiring a swift and overwhelming show of force. At all times, SWAT officers no less than others--dressed in camouflage or not--

29

> must keep it clearly in mind that we are not at war with our own people.

Holland v. Harrington, 268 F.3d 1179, 1190-95 (10th Cir. 2001) (emphasis in original).9

As with the Smiths' state-created danger claim, the district court did not reach the issue of qualified immunity. For the reasons expressed above, we will remand the case to allow the district court to determine that issue in the

first instance.

        c. Unreasonable Seizure

Even assuming that there was a seizure because Smith was still in the house when the police formed a perimeter around his property, the Smiths cannot establish a Fourth Amendment violation based on the officers' conduct following observation of the red dot by Marasco. We recognize that it is undisputed that officers did not have a warrant when they arrived at Smith's home or when they established a perimeter around his property before activating SERT and that a warrantless seizure in a person's home violates the Fourth Amendment unless both probable cause and exigent circumstances are present. See United States v. Payton, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382 (1980). But as we already have pointed out there was probable cause here to believe a crime had been committed. Thus, we address the exigent circumstances consideration. It is established that there are exigent circumstances if the safety of either law enforcement or the general public is threatened. Warden v. Hayden, 387 U.S. 294, 298-299, 87 S.Ct. 1642, 1645-46 (1967). A court makes the determination of whether there were exigent circumstances by reviewing the facts and reasonably discoverable information available to the officers at the time they took their actions and in making this determination considers the totality of the circumstances facing them. See United

_____

9. In Holland, the court of appeals affirmed the district court's grant of summary judgment in favor of the defendants on an excessive force claim based on the decision to activate the SWAT team, but reversed and remanded on the question whether the actions taken by the SWAT team once deployed were reasonable. Holland, 268 F.3d at 1191-92, 1195.

30

States v. Sculco, 82 F. Supp. 2d 410, 417 (E.D. Pa. 2000). Inasmuch as the officers had reason to believe that a laser-sighted weapon was being pointed at them, they had reason to fear for their own safety. Consequently, there were exigent circumstances and establishment of a perimeter did not constitute an unreasonable seizure.

        d. Unreasonable Search

The Smiths also contend that Marasco and Scianna engaged in an unreasonable search before they believed they were being sighted. Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property. United States v. Dunn, 480 U.S. 294, 300-01, 107 S.Ct. 1134, 1139 (1987). 10 In this case, after Smith failed to respond when Marasco and Scianna knocked at the front door, the officers, according to their testimony, proceeded into the backyard of the house and Marasco, at least, entered the garage. At that time, the officers did not possess a warrant, nor were there exigent circumstances, inasmuch as the officers simply

were responding to a minor complaint and there was no indication of any danger to the officers' or others' safety or of any other conduct suggesting the existence of an exigency. Furthermore, the district court found that the officers entered the curtilage, where Smith had a legitimate expectation of privacy, and we find no reason to disturb that finding.

The defendants correctly point out that courts generally recognize a "knock and talk" exception to the warrant requirement. See, e.g., Rogers v. Pendleton, 249 F.3d 279, 289-90 (4th Cir. 2001). Officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may. Id. According to one scholar,"when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their

_____

10. We need not discuss the extent of the curtilage of Smith's home for it is clear that the activity subject to Fourth Amendment scrutiny was within the curtilage whatever its extent and the defendants do not contend otherwise.

31

movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." Wayne R. LaFave, 1 Search and Seizure: A Treatise on the Fourth Amendment S 2.3(f) (3d ed. & Supp. 2003) (footnotes omitted). Rogers itself, however, stands for the proposition that this principle does not extend officers the right to make a general investigation in the curtilage based only on reasonable suspicion, at least where the inhabitant requests that the officers leave. Id.

Some courts of appeals have been more permissive of this sort of police activity, holding that it is reasonable and lawful as a matter of law for officers to move away from the front door as part of a legitimate attempt to interview a person. See United States v. Hammett, 236 F.3d 1054, 1060 (9th Cir. 2001) ("[A police] officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence."); United States v. Raines, 243 F.3d 419, 421 (8th Cir. 2001) (recognizing "that law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence" and finding that a deputy sheriff did not interfere with defendant's "privacy interest when he, in good faith, went unimpeded to the back of [defendant's] home to contact the occupants of the residence" to serve civil process); United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990) ("[I]f [the front] door is inaccessible[,] there is nothing unlawful or unreasonable about [a state police officer] going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person."); United States v. Anderson, 552 F.2d 1296, 1300 (8th Cir. 1977) ("We cannot say that the [federal law

enforcement] agents' action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search.").

Extrapolating from this line of cases, the district court appears to have suggested that officers may proceed to the back of a home when they do not receive an answer at the front door any time they have a legitimate purpose for

approaching the house in the first place. App. at 43. But the case law does not support such a sweeping proposition. For example, in Raines and Anderson the courts, after concluding that officers' entry into the curtilage constituted entry into an area in which the resident had a reasonable expectation of privacy, held that the officers' limited intrusions were justified under the facts of those specific cases. In Raines, an officer attempting to serve civil process who did not obtain an answer at the front door, proceeded to the backyard because he had observed several cars parked in the driveway and suspected that the inhabitants might be sitting outside on a summer evening, unable to hear his knocking. Raines, 243 F.3d at 420-21. In the back, he saw a makeshift fence with a ten-foot wide opening. Id. at 420. Through the opening, he saw a large number of marijuana plants growing, and he left immediately. Id. at 420-21.

In Anderson, officers investigating a theft proceeded to the back of a house after not receiving an answer at the front door when they heard a dog barking. Anderson, 552 F.2d at 1298. Suspecting that the owner might be with the dog, they proceeded to the back of the house, observing suspected stolen items through a window on the way. Id. After finding the dog alone, they immediately returned to the front of the house. Id. In Daoust , officers approached "an isolated log house dug into the side of a hill" in an attempt to question the owner as part of a drug investigation. Daoust, 916 F.2d at 758. They noticed toys in the driveway and observed that the front door was inaccessible, as it was five feet above ground and had no steps. Id. They knocked on a cellar door but did not receive an answer, and left. They later returned, and, after again not getting an answer at the cellar door, proceeded to the back of the house where they observed a firearm through a window. Id. In Hammett, however, the court flatly accepted the argument that it is necessarily reasonable for officers to proceed to the back of a house simply for the purpose of locating someone with whom to speak or to locate another door. Hammett, 236 F.3d at 1060.

Although the officers had a right to knock at Smith's front door in an attempt to investigate Shafer's complaint,

we reject the defendants' argument that this right necessarily extended to the officers the right to enter into the curtilage. Where officers are pursuing a lawful objective, unconnected to any search for the fruits and instrumentalities of criminal activity, their entry into the curtilage after not receiving an answer at the front door might be reasonable as entry into the curtilage may provide the only practicable way of attempting to contact the resident, as in Daoust, where the front door was inaccessible. Similarly, officers reasonably may believe, based on the facts available to them, that the person they seek to interview may be located elsewhere on property within the curtilage, as in Anderson and Raines, and, as in those cases, an officer's brief entry into the curtilage to test this belief might be justified. Furthermore, even where officers are only investigating a minor nuisance complaint, the circumstances of the investigation may indicate the presence of an exigency justifying entry into the curtilage. Cf. United States v. Rohrig, 98 F.3d 1506, 1518-25 (6th Cir. 1996) (holding that officers' warrantless entry into a house to locate and abate a nuisance--loud music played late at night of which neighbors from blocks away had complained --was justified by exigent circumstances and was reasonable).11

In this case, the district court did not make findings of fact to support its conclusion that the officers' decision to proceed to the back of Smith's house was reasonable given their original purpose of investigating Shafer's complaint. The court did not discuss the layout of the property or the position of the officers on that property. It is unclear from the record exactly how set off Smith's residence is from other properties, and there is no indication of whether the officers followed a path or other apparently open route that would be suggestive of reasonableness.

In addition, Marasco had been to Smith's residence in the past and had been in Smith's backyard once or twice before. A jury could conclude that he therefore knew that the Smith residence did not have a back entrance as seems

---

11. We express no opinion as to whether we would have found the circumstances presented in Rohrig to be exigent.

34

to be the case.12 If Marasco had such knowledge, then this is not a case where the officers necessarily acted reasonably in proceeding to the back of the house to find another entrance after receiving no answer at the front door. Cf. Daoust, 916 F.2d at 758 (holding that officers' conduct was lawful where they "went to the back 'looking for an accessible main floor entrance' not to see if unlawful activity was taking place, but as part of their efforts to interview Daoust"). It also appears that here the officers entered the backyard at least twice, spending a more significant amount of time looking around Smith's property

than did the officers in Raines and Anderson in looking around the properties involved there, and that the officers here did so despite having been instructed to leave if they did not receive an answer to their initial attempts to contact Smith. Furthermore, the district court did not address the fact that Marasco testified about entering Smith's garage after receiving no answer. The record indicates that the garage was in fact a part of the structure of the house itself.

In the circumstances, there remain questions of fact as to whether the officers' intrusion into the curtilage was reasonable in light of their asserted purpose in making their entry into Smith's property which was not to make a search. The district court therefore erred in granting summary judgment in favor of the defendants on the Smiths' unreasonable search claims.13

_____

12. In their reply brief the Smiths assert that"there were no doors into the residence" from "the backyard." Appellants' Reply br. at 27. Even if in fact there was a door there our result on the unreasonable search claim would not be changed.

13. Once again, the district court, having concluded that there had not been a constitutional violation, declined to address the qualified immunity issue. An individual's Fourth Amendment interest in the curtilage of his home has been well settled for over a century, and at least since the Supreme Court reaffirmed it in Dunn. On remand, the district court should address the specific conduct of the defendants in determining whether they are entitled to qualified immunity on these claims.

e. Malicious Prosecution

To prove malicious prosecution under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff 's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. See Donahue, 280 F.3d at 379-80. The Smiths' claim is based on the issuance of a warrant for Smith's arrest and the subsequent withdrawal of charges for lack of probable cause. As already discussed, however, based on the information available to officers at the time the warrant was sought, there was probable cause for arrest. Because initiation of the proceeding without probable cause is an essential element of a malicious prosecution claim, summary judgment in favor of the defendants was appropriate on this claim.

4. State-Law Claims

After granting summary judgment in favor of the

defendants on all of the Smiths' section 1983 claims, the district court dismissed their supplemental state tort law claims pursuant to 28 U.S.C. S 1367(c)(3). Because we reverse the district court's grant of summary judgment with respect to certain of the Smiths' section 1983 claims, we also will reverse the district court's dismissal of their related state-law claims and the district court on the remand should reinstate those claims. See Gruenke v. Seip, 225 F.3d 290, 308 (3d Cir. 2000); Erie County Retirees Ass'n v. County of Erie, 220 F.3d 193, 217 (3d Cir. 2000).

B. DISCOVERY ORDERS

The court directed that all discovery in this case was to be completed by October 26, 2001. On July 27, 2001, the Smiths filed a Rule 56(f) motion seeking an extension for discovery which the district court granted. Then on August 24, 2001, the defendants filed their motion for summary judgment. On August 24, 2001, the Smiths filed their first notices of deposition, providing 51 depositions to be taken over an approximately three-week period. A magistrate

judge thereafter denied their request for leave to take more than ten depositions, a limitation he earlier placed. The district court affirmed the magistrate judge's decision, stating, "We find plaintiff 's conduct has been dilatory and that no sufficient reason for taking the deposition has been made out." App. at 4. The district court reiterated these reasons and further noted that the Smiths had had the opportunity to depose "the major players" in the case in denying the Smiths' renewed motion in its November 14, 2001 order. App. at 22.

The Smiths ask us to reverse the district court's rulings largely because, according to them, all depositions would have been taken before the close of discovery. The district court's decision whether to grant leave to take additional depositions or to extend discovery is discretionary, however. Even if all depositions could have been completed before the close of discovery, and despite the fact that many other witnesses, in a case involving 46 defendants, may have been able to shed more light on the events in this case, we cannot conclude that the district court abused its discretion in finding that the Smiths' conduct was dilatory. The district court reasonably concluded that, given the Smiths' delay, granting their requests for leave would have been burdensome and unnecessary. Thus, on the record before us we cannot say that the court abused its discretion in entering its discovery orders. We note, however, that on the remand if the parties seek additional discovery the court is free to revisit the point.

IV. CONCLUSION

For the foregoing reasons, we will affirm in part and reverse in part the judgments of the district court. 14 We will

14. In closing we make the following observation. A reader of this opinion may find it strange that we are dealing with this case as if there were but one plaintiff and one defendant. While such treatment at least at this time is reasonable with respect to the Smiths who have a common interest in the liability issues, it may be questionable as to the defendants as they did not all do the same things and we doubt that all had the same knowledge of the germane facts. But we nevertheless have dealt with this case as a single party defendant case because the parties

37

affirm the district court's grant of summary judgment in favor of the defendants on the Smiths' First Amendment retaliation claim, Fourth Amendment unreasonable seizure and malicious prosecution claims, and substantive due process cover-up and mishandling the corpse claims and the district court's rulings on the Smiths' various discovery motions. We will reverse the district court's ruling with respect to the Smiths' state-created danger claim, excessive force claim, and unreasonable search claim, and remand the case to the district court for further proceedings consistent with this opinion. We also will reverse the order dismissing the Smiths' supplemental state-law claims and remand those claims to the district court. Our affirmance of the orders on the discovery motions is without prejudice to the Smiths seeking to reopen discovery.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

have done so in their briefs. Thus, the Smiths simply refer to the defendants as such and the defendants call themselves the state police. Yet it is entirely possible that some but not all of the defendants may be liable to the Smiths.

We therefore point out that just as a court should make a determination on a claim of qualified immunity only by analyzing the conduct of each defendant in a multi-party case, see Grant v. City of Pittsburgh, 98 F.3d at 122, so questions regarding the basic liability of the defendants ultimately must be answered on an individual basis. Consequently, we do not by this opinion preclude individual defendants from moving for summary judgment on claims against them that survive our disposition of this appeal.

38