**UNITED STATES of America**

v.

**Steven J. KING**

**No. 04–CR–177.**

United States District Court,
E.D. Pennsylvania.

April 26, 2005.

William T. Cannon, Philadelphia, PA, for Steven J. King.

Judson A. Aaron, Philadelphia, PA, for United States of America.

## MEMORANDUM OPINION

RUFE, District Judge.

In accordance with Local Appellate Rule 3.1, this Opinion addresses issues the

Court anticipates Defendant Steven J. King will raise on appeal to the United States Court of Appeals for the Third Circuit.

On November 15, 2004, after a four day trial, a jury convicted Defendant of one count of attempt to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846 [1] and one count of maintaining a place to manufacture methamphetamine in violation of 21 U.S.C. § 856(a)(1).[2] On March 29, 2005, the Court sentenced Defendant to 120 months of incarceration with credit for time served, to be followed by eight years of supervised release.

Defendant litigated numerous pretrial motions, which were heard on November 2, 2004 and ruled upon prior to trial. (N.T. 11/2/04 and N.T. 11/8/05 at 3–34).[3] Additionally, Defendant filed post-verdict motions,[4] followed by a letter to the Court.[5] The letter from Defendant's counsel informed the Court:

1. Specifically, in response to a special interrogatory the jury found that Defendant attempted to manufacture more than 5 grams of methamphetamine (specifically 13.5 grams of methamphetamine).

2. The jury found that Defendant maintained a place to manufacture methamphetamine in a garage at 6627 Greenway Avenue, Philadelphia, Pennsylvania.

3. On November 8, 2004 the Court issued findings of fact and conclusions of law on issues decided by pre-trial motion, and incorporates those findings of fact and conclusions of law herein in support of its prior rulings.

4. Defendant cited the following allegations of error which would warrant the grant of a new trial: 1) the Court erred in denying Defendant's Motion to Suppress Physical Evidence found within the house at garage at 6627 Greenway Avenue; 2) the Court erred in denying Defendant's Motion to Suppress Defendant's In–Custody Statements to the Police, not preceded by Miranda warnings, on the basis of the public safety exception to the Miranda requirements; 3) the Court erred in admitting Defendant's statements against interest as a hearsay exception; 4) the Court erred in finding Defendant's arrest without an arrest warrant was lawful, such arrest being effectuated outside of the jurisdiction of the arresting officers and in the absence of probable cause for arrest; 5) the Court erred in failing to grant Defendant's Rule 29 Motion for Acquittal as to Count 1 of the indictment; 6) the Court erred in failing to grant Defendant's Rule 29 Motion for Acquittal as to Count 2 of the indictment; 7) there was insufficient evidence to sustain the jury's finding that the Defendant attempted to manufacture more than five grams of methamphetamine; 8) the prosecutor committed reversible error in cross-examining Defendant as to his failure to volunteer to the police during interrogation the tenancy-in-possession of John Matteau as to the garage at 6627 Greenway Avenue; 9) the prosecutor committed reversible error in vouching for the credibility of the testifying police officers during his summation to the jury.

As to the fifth and sixth issues, upon careful review of the trial transcripts, the Court found that Defendant did not make any Rule 29 Motions for Acquittal.

Regarding the eighth issue, Defendant alleged that the prosecutor committed reversible error when he cross-examined Defendant as to his failure to inform police officers that he had leased the garage to another party and no longer had control over the garage. Defendant did not object to this line of questioning during the trial, and the Court does not find this line of questioning to constitute reversible error.

As to the ninth issue, Defendant alleged that the prosecutor committed reversible error when he vouched for the credibility of the testifying police officers during his summation to the jury. Having reviewed the closing statements of the government, the Court finds no instances of the prosecutor vouching for the credibility of the government's witnesses. Rather, the prosecutor described what the evidence showed and failed to show, and discussed who had motive to lie in this case. See N.T. 11/12/04 at 204–206; 248–252; 254–256. Furthermore, Defendant did not object to this portion of the prosecutor's closing arguments.

5. Letter from Defense Counsel William Cannon dated March 9, 2005.

I have had the opportunity to read through the transcripts of both the suppression hearing presided over by Your Honor on November 2, 2004 and the trial of the case conducted between November 8, 2004 and November 15, 2004. I am unable to discovery any substantive legal issues that arose during the actual trial of the case that would give rise to post-verdict argument in favor of a new trial.

The letter went on to say that Defendant would rely on his pre-trial briefs, and would not be briefing any of the additional issues raised in his post-trial motion.

## I. Discussion

### A. Sufficiency of Evidence

■ The jury heard four days of testimony in this case, and the Court believes that the evidence before the jury was sufficient to warrant the guilty verdict on both counts of the indictment. The Court will provide a summary of the facts in evidence.

The owner of property at 6627 Greenway Avenue, Philadelphia, Pennsylvania, Fernando Falone, testified that he had been renting the property to Defendant since September 2001. Between September 2001 and July 2003, Defendant rented the entire property, which included a house, a large garage, and fourteen small garages. From September 2001 through January 2003, he paid Mr. Falone $1500 per month in rent. After January 2003, Defendant and Mr. Falone entered into a new agreement; rather than paying rent, Defendant agreed to make repairs to the property, rent the various buildings once the repairs were completed, and manage the property once the tenants were in place. Defendant continued to be the tenant of that property as of July 2003, and was still making repairs to the house and large garage as of July 2, 2003. Defendant maintained a residence elsewhere and did not live at the property.

The Philadelphia Police Department began to investigate Defendant and his activity at the Greenway Avenue property in late 2002, because they believed Defendant was operating a clandestine methamphetamine laboratory in the large garage there. This investigation was conducted jointly with the Delaware County Criminal Investigation Division, and the Darby Borough and Darby Township Police Departments. Office Brian Monaghan of the Philadelphia Police Department began surveillance of the Greenway Avenue property in January 2003. He testified that he saw Defendant enter and leave the house at Greenway Avenue many times. He also observed him walking around the side of the large garage, but could not see the side door to the garage from the street.

On July 2, 2003, Officer Monaghan obtained a search warrant for the Greenway Avenue property. While he was doing this, Philadelphia police, including the bomb disposal unit and the special weapons and tactics (SWAT) unit, along with Delaware County police proceeded to the Greenway Avenue property. Because of the risks associated with clandestine methamphetamine laboratories, officers closed the street to traffic and evacuated the neighbors. The Philadelphia fire department also proceeded to the property, with fire trucks, foam trucks, fire rescue and a hazardous materials team.

As officers arrived on the scene, Defendant was observed driving a gold Buick Riviera away from the rear of the property. Sergeant Otto received this information over the police surveillance radio as he was driving to Greenway Avenue. Sergeant Otto arrested Defendant after a car stop and transported him back to 6627 Greenway Avenue in a police vehicle. Upon arrival at 6627 Greenway Avenue,

Sergeant Otto moved Defendant onto the porch and informed Defendant that he needed to ask him some questions about the contents of the garage in order to ensure the safety of the officers on the scene. At this time, no officers had yet entered the garage, which contained the suspected clandestine methamphetamine laboratory. Sergeant Otto, in the presence of two or three other officers, asked Defendant specific questions regarding particular safety threats connected with clandestine methamphetamine laboratories (e.g. booby traps, toxic fumes, chemicals and explosions). Defendant made an admission against interest in response to Sergeant Otto's questions, stating that the officers would not find anything in the garage that would hurt anyone, but they would find a quarter ounce of "finished product" there. He also identified the correct keys to the garage doors, including a padlocked outer door and a locked office door inside. Defendant was then moved to a patrol vehicle down the street. Sergeant Otto gave the garage keys to a member of the police clandestine lab entry team.[6]

While Defendant was secured in the police vehicle, Detective Frey testified that he approached Defendant and obtained verbal and written consent to search Defendant's residence at 19 N. McDade Boulevard in Delaware County. When officers searched the property at 19 N. McDade Boulevard they found $13,500.00 in cash, syringes, and "residue bags" in the bedroom ceiling.

One of the clandestine laboratory entry team members, Detective Edward McGrory, questioned Defendant about safety concerns before any team officers entered the garage. He asked Defendant if any active "cooking" was going on in the garage, what materials and chemicals were inside, and whether the garage was "booby trapped." Defendant informed him that he had cooked earlier that day, that there was no P2P in the garage, and that the ammonia tanks in the garage were empty. Detective McGrory asked where the ammonia came from, and Defendant said he had obtained it from farms in Bucks County.[7]

After questioning Defendant, Detective McGrory and three other members of his unit donned protective gear and oxygen masks and entered the garage at 6627 Greenway Avenue, with a gauge for measuring hazardous gases in the air.[8] A member of the bomb squad entered with them, to detect and diffuse any booby traps inside.[9] After the clandestine laboratory

---

6. The clandestine laboratory entry team is a specially trained unit of the police force. The officers on this team must initially enter a suspected methamphetamine laboratory and assess its safety. Once the location is deemed safe for other police personnel to enter, this team works with police department chemists to collect evidence and dismantle the clandestine laboratory.

7. At the pretrial hearing, Detective McGrory testified that Defendant admitted he stole the ammonia from farms in Bucks County. The Court did not allow the jury to hear that Defendant admitted "stealing" the ammonia, because of the possible prejudicial effect of that term. Instead, Detective McGrory testified that Defendant informed him that he "obtained" the ammonia from farms in Bucks

county. The form of ammonia used to produce methamphetamine is commonly and legally used by farmers in fertilizer.

8. Detective McGrory testified that although he had asked Defendant safety related questions and Defendant had informed him that there were no potential hazards in the garage, he did not necessarily rely on Defendant's information and so the team took all the precautions when entering the garage that they would take when entering any suspected site of a clandestine methamphetamine laboratory.

9. Several officers testified to being taught that booby traps are commonly used to protect clandestine methamphetamine laboratories.

team ensured that the garage did not pose a danger, they opened the garage door to ventilate the space. Additional law enforcement personnel, including chemists, entered the garage to search for any physical evidence that it was used as a clandestine methamphetamine laboratory. The chemists transported certain evidence back to the Philadelphia police department laboratory for analysis, and left the rest for the hazardous materials team to remove and destroy because of the potential dangerousness of the chemicals involved.

Physical evidence found in the garage included equipment and ingredients needed to manufacture methamphetamine using the "Nazi" method.[10] Specifically, the officers found: 1) a coffee grinder, rubbing alcohol, ever clear alcohol, cold tablets containing pseudoephedrine, and 175.5 grams of ephedrine powder; 2) boxes of lithium batteries and lithium batteries in a vice grip in the process of being cut up; 3) empty metal gas cylinders and a thermos, which can be used to store anhydrous ammonia for up to twenty hours; 4) toluene solvent and a freon box; 5) a filtering device and paper filters; 6) table salt and drain cleaner; and 7) a heating element and vacuum flask, which could be used to dry the finished product. Officers also

found laboratory glassware and plastic tubing useful in manufacturing methamphetamine, a Merck Index of chemicals, containers of Vita Blend (a mixture of B vitamins often mixed with methamphetamine to add weight to the product), an air purifying respirator,[11] and a digital scale. Defendant denied knowing that any of these items were in the garage.

Officers also found a large flask containing 3.371 liters of yellow oil and a smaller bottle containing yellow-orange liquid, both of which later tested positive for methamphetamine. Philadelphia police department chemist Colleen Brubaker testified that the yellow oil in the flask was methamphetamine oil, that the chemical reaction which produces methamphetamine had already occurred, and that the oil was one step from becoming "finished product." She testified that she took a measured sample of the oil, completed the last step of the "Nazi Method" in the police department laboratory, measured the finished product, and extrapolated to determine that at least 13.5 grams of finished methamphetamine could have been produced from the oil in the flask using the equipment found in the garage at 6627 Greenway Avenue.[12]

10. A DEA chemist testified that the "Nazi" method requires: 1) ephedrine or pseudoephedrine, which can be extracted from cold medication tablets using a coffee grinder and some alcohol; 2) lithium, which can be extracted from lithium batteries by cutting into them; 3) anhydrous ammonia, often stolen from farms where it is used as fertilizer; 4) water and a solvent like ether, toluene, freon or charcoal lighter fluid; 5) filters; and 6) hydrogen chloride gas, which can be produced from table salt mixed with drain cleaner. Generally, once methamphetamine crystals form, the liquid is filtered away and a vacuum and/or heat source is used to dry the finished product.

11. The odor of ammonia can be very strong when manufacturing methamphetamine and

the respirator would help a person breathe in that environment.

12. Defendant specifically argues that there was insufficient evidence to sustain a jury finding that he attempted to manufacture more than 5 grams of methamphetamine. The testimony on this issue, given by Philadelphia Police Department Chemist Colleen Brubaker, is set forth in the November 10, 2004 transcript at pages 180–186. The jury apparently credited this testimony in finding that Defendant had attempted to manufacture 13.5 grams of methamphetamine. Ms. Brubaker's testimony regarding her scientific methods and calculations was detailed, and was sufficient evidence to sustain the jury's finding.

In addition to evidence of a methamphetamine laboratory, the officers found a telephone bill dated June 25th, 2003, which was addressed to Defendant at another address, along with copies of two bank checks signed by Defendant in January and February 2003 inside the garage. They also observed wall graffiti with Defendants name and initials. The day following the arrest, another police officer found additional documents linking Defendant to the garage at 6627 Greenway Avenue, including a March 2003 bank statement addressed to Defendant and a June 23, 2003 past due rent notice addressed to Defendant for rent owed on his automobile salvage business property. In the house at 6627 Greenway Avenue police found additional documents belonging to Defendant but no evidence related to manufacture or sale of methamphetamine.

The testimony and physical evidence, when viewed in the light most favorable to the verdict winner, establishes sufficient evidence to support the jury's verdict on each count of the indictment, and the jury's finding that Defendant attempted to manufacture more than five grams of methamphetamine.

B. *Search Warrants for 6627 Greenway Avenue*

■ Defendant asserts that the search warrants for 6627 Greenway Avenue were not supported by probable cause, requiring the Court to suppress the evidence found in the house and garage. Because reasonable minds can differ on whether a particular affidavit establishes probable cause for a warrant, the Court may only exercise deferential, not *de novo,* review of the issuing authority's probable cause determination.[13] When issuing a search warrant, the issuing authority has a duty to consider the facts set forth in the supporting affidavit, and the veracity and basis for knowledge of persons supplying hearsay information.[14] Probable cause to issue a warrant exists if it appears from a commonsense review of the circumstances set forth in the affidavit that "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[15] Issuing authorities are obligated to read affidavits in their entirety and in a commonsense and nontechnical way.[16]

The facts established at the pre-trial motion hearing were ascertained by the Court as follows:

In late 2002, narcotics units of the City of Philadelphia and Delaware County police departments began investigating Defendant's activities in a house and garage at 6627 Greenway Avenue, Philadelphia, Pennsylvania.[17] Delaware County Police Sergeant Michael Boudwin had received information from a confidential informant ("CI–1") that Defendant was operating a clandestine methamphetamine laboratory, selling methamphetamine, and storing cash profits from the sale of methamphetamine at 6627 Greenway Avenue. Sergeant Boudwin knew that CI–1 had previously proven to be reliable, and that CI–1's past information led to arrests and convictions. Sergeant Boudwin pro-

---

13. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

14. *Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

15. *Id.*

16. *United States v. Conley,* 4 F.3d 1200, 1206 (3d Cir.1993).

17. 6627 Greenway Avenue was not Defendant's residence. He testified that he rented the property so that he could use the garage for storage and he also served as the property manager.

vided this information to the City of Philadelphia Police Department narcotics unit. The Philadelphia police then began surveillance of Defendant and 6627 Greenway Avenue.

On July 2, 2003, Sergeant Boudwin informed Philadelphia Police Officer Brian Monaghan that a second confidential informant ("CI–2") had just made a police-controlled purchase of methamphetamine at a garage located behind the residence at the Greenway property. That afternoon, Officer Monaghan and Sergeant Robert Otto (also of the City of Philadelphia Police Department narcotics unit) met with Sergeant Boudwin and CI–2. During this meeting, Officer Monaghan learned that the Delaware County police had briefed CI–2 on how to make the purchase, searched him for contraband and money (finding none), gave him a quantity of money, and instructed him to enter a large garage with a grey steel security door behind the Greenway Avenue home to buy methamphetamine. Delaware County police officers observed CI–2 walk down the driveway towards the garage and return via the same route. From their vantage point, the police officers could not see CI–2 enter or leave the garage itself. When CI–2 emerged after being out of the officers' sight for approximately five minutes, he held a quantity of brownish crystals and no longer had the money provided by the Delaware County police. Turning the brownish crystals over to the officers for evidence, CI–2 told them that he bought the substance from Defendant inside the large

garage at the property,[18] that the garage contained equipment used to manufacture methamphetamine, and that Defendant was "cooking" or manufacturing methamphetamine while CI–2 was in the garage. Sergeant Boudwin field tested the brownish crystals turned over by CI–2 during the July 2, 2003 meeting, and they tested positive for methamphetamine.

Officer Monaghan swore an affidavit of probable cause, which contained only statements he believed to be accurate and true. Officer Monaghan requested separate search warrants for the house and garage at the Greenway Avenue property, because he was not able to ascertain from the street whether the structures were attached or detached. However, Officer Monaghan used the same affidavit of probable cause to support both warrant requests. Based on the information set forth in Officer Monaghan's affidavit of probable cause, the Court found that the affidavit contains legally sufficient information on its face to justify issuing search warrants for both the house and garage at 6627 Greenway Avenue. The affidavit, when read in a commonsense manner, making reasonable inferences, provided the factual basis for believing that evidence of a crime would be found at 6627 Greenway Avenue. Bail Commissioner O'Brien signed both search warrants. Accordingly, it was objectively reasonable for police officers to rely upon these warrants and to execute the search of 6627 Greenway Avenue, and the physical evidence seized under these warrants was properly admitted at trial.[19]

---

18. A dozen or more smaller garages were located at the rear property, behind the large garage that was the subject of the police investigation.

19. At the November 2, 2004 hearing, Defendant withdrew allegations that Officer Mona-

ghan knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit of probable cause and withdrew his request for an evidentiary hearing on that issue.

## C. *Defendant's Arrest*

 Defendant raises two issues regarding the legality of his arrest. First, he argues that Philadelphia Police Sergeant Otto did not have jurisdiction to arrest Defendant in Delaware County. This is incorrect. Under Pennsylvania law, police officers have the power and authority to enforce the laws of the Commonwealth outside their primary jurisdiction under most circumstances.[20] In this case, Sergeant Otto's pursuit of Defendant began in Philadelphia County, very near the site of the controlled methamphetamine purchase by CI–2, was an immediate response to receiving the radioed information that Defendant leaving the property at 6627 Greenway Avenue in a gold Buick Riviera as police arrived to conduct a search, and was a chase that continued without interruption until Defendant was stopped and arrested just over the county line in Delaware County. Sergeant Otto was thus in fresh and hot pursuit of Defendant when Defendant crossed the county line. Furthermore, Sergeant Otto had probable cause to believe Defendant had committed a felony by selling methamphetamine to CI–2 earlier that day at 6627 Greenway Avenue in Philadelphia county,[21] he made a reasonable effort to identify himself as a police officer, and he had reason to believe that Defendant was engaging in an act (manufacture of methamphetamine) which presented a clear and present danger to persons or property. Based on the facts of this case, Sergeant Otto had the power and authority to arrest Defendant in Delaware County under several provisions of the Statewide Municipal Police Jurisdiction statute.[22]

 Second, Defendant argues that the police did not have an arrest warrant or probable cause to stop his vehicle or to arrest him and therefore all of his post-arrest statements should have been suppressed as fruit of a poisonous tree. A warrantless arrest is constitutionally valid if an officer has probable cause to make the arrest. Probable cause exists if the facts and circumstances within the arresting officer's knowledge are sufficient to establish a reasonable belief that the individual has committed or is committing a criminal offense.[23] The information forming the basis for an officer's belief must be "reasonably trustworthy."[24] Information received from a confidential informant can form the basis for probable cause to arrest, if it can reasonably be deemed reliable.[25] An informant may be deemed reliable if the informant has been reliable in the past, if police have independently corroborated a tip, or if the informant himself participated in the criminal activity.[26]

In *United States v. Beasley*, when the officers arrived on the scene to execute a search warrant, the suspect drove away from the scene of the search. The court found that the subsequent stop and arrest was amply justified based on the confidential informant's information that the suspect was manufacturing illegal drugs, and was further justified by the fact that the officers knew that the suspect did not live

---

20. 42 Pa. Cons.Stat. § 8953.

21. *Id.*

22. *Id.*

23. *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir.2003).

24. *United States v. Beasley*, 412 F.Supp. 447, 449 (E.D.Pa.1975), *aff'd*, 538 F.2d 321 (3d Cir.1976).

25. *Id.; see also Pennsylvania v. Luv*, 557 Pa. 570, 735 A.2d 87, 90 (1999).

26. *Luv*, 735 A.2d at 90.

at the search site and might be difficult to find later if they did not swiftly apprehend him.[27] This case presents nearly identical facts. Police arrived at 6627 Greenway Avenue with a search warrant and found Defendant driving away. Police had reason to believe Defendant had committed a felony earlier that day because they had executed a controlled purchase of methamphetamine from Defendant using CI–2 as the buyer. CI–2 had proved to be a reliable informant in the past. The Court found, based on the totality of the circumstances, that police had probable cause to stop and to arrest Defendant. In addition, exigent circumstances existed in that Defendant was observed driving away from a suspected clandestine methamphetamine laboratory, and public safety was at risk if the police could not interview Defendant as to the contents of the garage before executing the search warrant. For these reasons, the Court found that Sergeant Otto legally stopped and arrested Defendant, and accordingly did not suppress any post-arrest statements by Defendant.

### D. Admissibility of Statements Made Before Miranda Warnings

■ Defendant argues that the Court should have suppressed inculpatory statements he made to Sergeant Otto and Detective McGrory, because he was not given Miranda warnings prior to questioning. Both officers testified that the primary object of their questions was to obtain safety information from Defendant before law enforcement personnel entered the potentially dangerous clandestine methamphetamine laboratory. The questions they asked Defendant were consistent with this goal.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) the Supreme Court held that, before questioning a person in custody, law enforcement officials must inform the person that he has the right to remain silent, the right to have an attorney present during questioning, and the right to a court-appointed attorney if he cannot afford an attorney. Officials must also inform the person in custody that if he chooses to speak, anything he says can be used against him in a court of law.[28]

However, a public safety exception to the requirement that police give *Miranda* warnings exists in certain circumstances. In *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), police officers questioned a suspect, without administering Miranda warnings, about the location of a gun which had been in his possession until the police came on the scene. The Supreme Court reasoned:

> Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's questions about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to the question not simply to make his case against Quarles, but to insure that further danger to the public did not result from the concealment of the gun in a public area.[29]

---

27. *Id.*

28. *Id.*

29. *Quarles,* 467 U.S. at 657, 104 S.Ct. 2626.

The Court concluded that the need for answers to questions in a situation posing a threat to public safety outweighs the need for the *Miranda* warnings.[30] In such situations, a defendant must show *actual coercion* by an officer to have the information obtained during questioning suppressed or excluded:

> Absent actual coercion, there is no constitutional imperative requiring the exclusion of the evidence that results from police inquiry of this kind; and we do not believe that the doctrinal underpinnings of *Miranda* require us to exclude the evidence, thus penalizing officers for asking the very questions which are the most crucial to their efforts to protect themselves and the public.[31]

Although the Court finds that Defendant was in police custody when Sergeant Otto and Detective McGrory questioned him,[32] that fact did not diminish the dangers associated with having police officers enter the suspected clandestine methamphetamine laboratory. A clear threat of harm remained, and obtaining information from Defendant could minimize this threat. Sergeant Otto and Detective McGrory directed their questions to Defendant solely to obtain information that would help them safely address the potentially volatile and dangerous situation confronting police at the scene, and not simply to obtain incriminating information from Defendant. The Court heard no evidence suggesting that the officers used coercive methods to obtain answers to their questions. Accordingly, Defendant's statements made during questioning by Sergeant Otto and Detective McGrory fell under the public safety exception to *Miranda*, and the Court did not suppress or exclude them.[33]

Having first found that the statements Defendant made to police without benefit of Miranda warnings were admissible under the public safety exception, the Court then found it could properly admit these statements into evidence under the hearsay exception for statements against interest under Federal Rules of Evidence 801(d)(2)(A).

### E. Search of Defendant's Home

■ While Defendant was being detained by police at the Greenway Avenue property during their search, an officer asked Defendant for consent to search Defendant's residence at 19 N. McDade Boulevard, Delaware County, Pennsylvania. After being advised of his Fourth Amendment right to refuse consent, which refusal would necessitate the police obtaining a search warrant, Defendant signed a form consenting to a search of his home. Defendant also gave verbal consent. His consent to the search was consistent with his generally cooperative attitude toward the officers on the scene. At the time he consented to this search, officers had only asked Defendant safety-related questions and had not subjected him to extensive interrogation. The Court found that Defendant's consent was informed and was not coerced. Law enforcement officers may conduct a search without a warrant or probable cause upon an individual's informed consent, and any physical evidence discovered is admissible at trial.[34] Accord-

---

30. *Id.*

31. *Id.* at 658, 104 S.Ct. 2626.

32. *See Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

33. The statements Defendant made during police questioning were statements against his own interest, or admissions. Therefore the statements are not hearsay and were admissible at trial. Fed.R.Evid. 801(d)(2)(A).

34. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

ingly, the Court denied Defendant's motion to suppress evidence discovered during the search of his residence.

### F. *Sentencing*

On March 29, 2005, the Court sentenced Defendant to serve 120 months incarceration with credit for time served, to be followed by eight years of supervised release, in addition to other conditions imposed. The Court found that Defendant had been previously convicted of using and distributing methamphetamine. Because Defendant has a prior felony drug conviction, the applicable statutory minimum sentence is 10 years imprisonment followed by 8 years of supervised release. 21 U.S.C. § 841(b)(1)(B).

The Court believed the statutory minimum sentence adequately addressed the seriousness of his crime, the danger that Defendant's criminal activities posed to the community, his criminal and drug use history, and the need to protect the public from future crime. The Court imposed the statutory minimum sentence, believing that would provide sufficient deterrence and punishment as well as an opportunity for rehabilitation. The Court also assessed a $10,000 fine, which is a reduction from the sentencing guidelines advice, but which the Court believed was an appropriate monetary penalty for Defendant's circumstances and one which he had the financial means to pay. Finally, the Court ordered Defendant to participate in drug treatment while in custody and on supervised release, because Defendant admitted to a history of drug abuse and has been involved in the drug culture for approximately twenty years.

### II. *Conclusion*

For the foregoing reasons, the Court denied Defendant's post-trial motions and

imposed a sentence in accordance with the jury's verdict, the applicable statutory and mandatory sentences, as well as the Court's sentencing requirements and the advise of the now discretionary federal sentencing guidelines.[35]

---

**35.** The Court also considered the government's recommendation that the Court sentence Defendant to the minimum statutory sentence under 21 U.S.C. § 841(b)(1)(B).