**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2371
_____

ANDREW CARMAN and KAREN CARMAN,
                                    Appellants
                    v.

JEREMY CARROLL


_____


On Appeal From the United States District Court for the
Middle District of Pennsylvania
(No. 3:10-cv-01013)
District Judge: Honorable James M. Munley
_____

Argued: December 17, 2013

Before: MCKEE, *Chief Judge*, FUENTES, *Circuit Judge*, and
SCHILLER, *District Judge*.[1]

_____

[1] Honorable Berle M. Schiller, United States District Court
for the Eastern District of Pennsylvania, sitting by
designation.

1

(Opinion Filed: May 15, 2014)

Barry H. Dyller, Esq. **[ARGUED]**
Kelly A. Bray, Esq.
88 North Franklin Street
Wilkes-Barre, PA 18701

*Attorneys for Appellants Andrew Carman and Karen Carman*

Kathleen G. Kane
Sean A. Kirkpatrick **[ARGUED]**
John G. Knorr, III
Office of Attorney General
Appellate Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120

*Attorneys for Appellee Jeremy Carroll*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

Responding to a police dispatch, Pennsylvania State Trooper Jeremy Carroll and another trooper proceeded to the home of Andrew and Karen Carman to search for a man who had stolen two loaded handguns and a car with New Jersey plates. Upon arriving at the Carmans' residence, the troopers bypassed the front door and went directly to the back of the house and onto a deck adjoining the kitchen. On the deck, a

scuffle ensued between Carroll and Andrew Carman. This § 1983 action arises from Carroll's warrantless entry onto the Carmans' property. Carroll contends that he did not violate the Carmans' Fourth Amendment rights because he entered into their curtilage, the area immediately surrounding their home, while executing a legitimate "knock and talk" encounter. Because Carroll proceeded directly through the back of the Carmans' property and did not begin his visit at the front door, the "knock and talk" exception to the warrant requirement does not apply. Therefore, we reverse the District Court's denial of the Carmans' motion for judgment as a matter of law on their unlawful entry claim. We affirm the jury verdict regarding the Carmans' unlawful seizure claim because there was sufficient support for the jury's finding that Carroll acted reasonably.[2] Accordingly, we affirm in part and reverse in part the judgment of the District Court.

---

[2] In reviewing a jury verdict, "[w]e are not free to weigh the evidence or to pass on the credibility of witnesses," but rather "[o]ur function is to determine only whether there is evidence upon which the jury could properly return a verdict, viewing the evidence most favorably to . . . the non-movant, and giving [the non-movant] the benefit of all reasonable inferences." *Kinnel v. Mid-Atlantic Mausoleums, Inc.*, 850 F.2d 958, 961-62 (3d Cir. 1988). Therefore, we construe the facts in the light most favorable to Carroll, the non-movant.

## I.

### A.

In July 2009, Pennsylvania State Police Troopers Jeremy Carroll and Brian Roberts were dispatched to the Carmans' residence to search for a man named Michael Zita and a car bearing New Jersey license plates. The troopers were told that Zita had stolen the car, was armed with two loaded handguns, and might have fled to the Carmans' residence. Neither Roberts nor Carroll had been to the Carmans' property before, and neither knew what Zita looked like. The troopers did not have a warrant to search the Carmans' property nor did they have a warrant to arrest Zita.

The Carmans' house sits on a corner lot. The main street runs along the front of the house and a side street runs along the left of the house, as viewed from the front. A clearly marked path leads to the front door. *See* Pl.'s Exs. 22, 26.[3] There is no other marked path to the Carmans' house. A stone parking area is located on the left side of the house, *see* Pl.'s Ex. 25, and a shed and carport, which the parties refer to as a "garage," are located in the Carmans' backyard.

The Carmans also have a back deck that adjoins their kitchen area. *See* Pl.'s Ex. 18, 21. Two sets of stairs lead up to the deck, and a sliding glass door by the deck leads to the kitchen. *See id.* However, the Carmans testified that visitors use the front entrance when they come to visit.

---

[3] For ease of reference, various photographs introduced at trial are appended to this Opinion.

When the troopers arrived at the Carmans' home, Andrew and Karen Carman were sitting in their kitchen with Karen Carman's sister; they were the only people present at the home. Because there was no parking in front of the Carmans' house, the troopers drove down the side street, passed numerous cars parked along the side of the Carmans' house, and parked their cars at the first available spot, at "the far rear of the property." App. 79. The troopers then got out of their cars, entered the Carmans' backyard, and headed toward the garage. Carroll purportedly took this route because he saw a light on in the garage and thought someone might be there. He "poked [his] head in" the garage "and said, Pennsylvania State Police," but "there was nobody in there." App. 80.

Carroll thought the sliding door attached to the back deck of the house "looked like a customary entryway." App. 92. Thus, after searching the garage and finding no one there, he and Roberts continued walking through the backyard and proceeded to the back deck. As the troopers stepped onto the deck, Andrew Carman came out of the house. Carman was belligerent and aggressively approached the troopers, asking, "Who the fuck are you?" App. 63, 80-81. Given Carman's behavior, Carroll thought the man he was speaking with might be Zita. Carroll informed him that they were looking for Zita and asked Carman to identify himself. Carman refused to divulge his identity, made a quick turn away from the troopers, and appeared to reach for his waist, bringing his hands outside the troopers' view. Still unsure of Carman's identity, Carroll feared that Carman might be reaching for a weapon. He, therefore, momentarily grabbed Carman's right arm. Upon seeing that Carman was unarmed, he let go. Carman twisted and fell off the deck.

Karen Carman subsequently exited her house and came onto the deck with her sister. The two women were screaming when they approached Roberts. Consequently, Roberts ordered them to stand back and drew his Taser. Karen Carman asked the troopers what was going on, and Carroll explained that they were looking for Zita and asked her if they could search the house for him. She gave her consent and everyone went into the house.

The troopers searched the Carmans' house and did not find Zita. The stolen vehicle was not at the Carmans' residence, and the Carmans were not charged with any crimes.

**B.**

Andrew and Karen Carman brought this case pursuant to 42 U.S.C. § 1983, alleging that Carroll violated their Fourth Amendment rights. In particular, the Carmans' two-count complaint alleged that Carroll's warrantless entry into their backyard, garage, back deck, and home constituted an unlawful search and that Carroll unreasonably seized Andrew Carman. Before trial, the Carmans advised the District Court of the Supreme Court's recent decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013), and asserted that they should be entitled to a directed verdict at trial based on that case. They also submitted a proposed jury instruction regarding the "knock and talk" exception to the warrant requirement; their instruction cited heavily to *Jardines*.

The District Court conducted a two-day jury trial. After opening arguments, the Carmans moved for a directed

verdict, effectively a judgment as a matter of law, on their unlawful entry claim.[4] At the close of Carroll's testimony, the Carmans renewed their request for judgment as a matter of law on the unlawful entry claim and also moved for judgment as a matter of law on their unreasonable seizure claim. Carroll moved for judgment as a matter of law on the Carmans' unlawful entry claim on the ground that he was entitled to qualified immunity. The District Court denied all of the motions without explanation.

The District Court also rejected the Carmans' proposed jury instruction regarding the "knock and talk" exception. Over the Carmans' objections, the District Court charged the jury with a different instruction; the District Court's instruction cited language from our decision in *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003), but did not cite *Jardines*.

---

[4] As a result of the 1991 Amendment to Federal Rule of Civil Procedure 50(a), the term "directed verdict" has been abandoned and replaced with the term "judgment as a matter of law." Therefore, we construe the parties' motions for a directed verdict as motions for judgment as a matter of law under Rule 50(a). *See Wittekamp v. Gulf & W., Inc.*, 991 F.2d 1137, 1141 n.6 (3d Cir. 1993) ("The parties' briefs have referred to the motion as seeking a directed verdict, but the motion more appropriately is termed a motion for judgment as a matter of law because the 1991 revision to Rule 50(a) abandoned the term 'directed verdict.'").

Ultimately, the jury returned a verdict finding in Carroll's favor on both claims. Judgment was entered on April 10, 2013. This appeal followed.[5]

## II.

On appeal, the Carmans argue that the District Court erred in denying their motions for judgment as a matter of law on their Fourth Amendment unlawful entry and unreasonable seizure claims. The Carmans also argue that the District Court provided an erroneous jury instruction regarding the "knock and talk" exception to the warrant requirement.

## A.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Under the Fourth Amendment, a search occurs when the government: (1)

---

[5] We have jurisdiction over this case under 28 U.S.C. § 1291. We exercise plenary review over a district court's denial of judgment as a matter of law. *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 545 n.8 (3d Cir. 2007). Such a motion "should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Brownstein v. Lindsay*, 742 F.3d 55, 63 (3d Cir. 2014) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)) (internal quotation marks omitted).

physically intrudes on constitutionally protected areas, *see Jardines*, 133 S. Ct. at 1414, or (2) invades "a subjective expectation of privacy that society recognizes as reasonable," *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)). *Accord Jardines*, 133 S. Ct. at 1417 ("The *Katz* reasonable-expectations test 'has been *added to,* not *substituted for,*' the traditional property-based understanding of the Fourth Amendment . . . ." (quoting *United States v. Jones*, 132 S. Ct. 945, 952 (2012))).

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). This rule is "subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz*, 389 U.S. at 357). We "regard the area 'immediately surrounding and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" *Jardines*, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *see also Marasco*, 318 F.3d at 518 ("Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property."). Thus, we presume a warrantless search of curtilage to be unreasonable.

**B.**

From the moment that Carroll entered the Carmans' backyard, he was in the curtilage surrounding their house. It is undisputed that Carroll entered into the Carmans' curtilage without a warrant, without consent, and without exigent

circumstances. Carroll argues that he nonetheless did not violate the Fourth Amendment because he entered the Carmans' property while conducting a "knock and talk." As he correctly points out, a "knock and talk" encounter is a permitted exception to the warrant requirement. Accordingly, we assess whether this exception applies to this case.

Under the "knock and talk" exception, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Jardines*, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011)); *see also Marasco*, 318 F.3d at 519 ("Officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may."). Needless to say, government officers cannot benefit from the "knock and talk" exception simply because they knock on a door. For purposes of the Fourth Amendment, a "knock and talk" is a brief, consensual encounter that begins at the entrance used by visitors, which in most circumstances is the front door.[6] A "knock and talk" encounter must satisfy three requirements.

First, a police officer, like any visitor, must "knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *See Jardines*, 133 S. Ct. at 1415.

---

[6] We recognize that there may be some instances in which the front door is not the entrance used by visitors. Despite Carroll's argument to the contrary, this is not one such instance.

Second, the purpose of a "knock and talk" must be to interview the occupants of a home, not to conduct a search. *See id.* at 1416 n.4 ("[I]t is not a Fourth Amendment search to approach the home in order to speak with the occupant, *because all are invited to do that*. . . . But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search."); *Marasco*, 318 F.3d at 520 (noting that the "knock and talk" exception may apply "[w]here officers are pursuing a lawful objective, *unconnected to any search* for the fruits and instrumentalities of criminal activity" (emphasis added)). In *Jardines*, for example, the officer's entry into the curtilage violated the Fourth Amendment because his "behavior objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think he had license to do." 133 S. Ct. at 1417.

Third, a "knock and talk" encounter must begin at the front door because that is where police officers, like any other visitors, have an implied invitation to go. It is well settled that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Id.* at 1415 (quoting *Breard v. Alexandria,* 341 U.S. 622, 626 (1951)) (internal quotation marks omitted). This implied invitation "typically permits the visitor to approach the home by the front path . . . . Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id.* at 1415.

Although officers have a right to knock at the front door while executing a "knock and talk," this right does not "necessarily extend[] to the officers the right to enter

11

[elsewhere] into the curtilage." *Marasco*, 318 F.3d at 520. In *Marasco*, we recognized that an officer's entry into other parts of the curtilage "*after not receiving an answer at the front door* might be reasonable" in limited situations. *Id.* (emphasis added). However, we rejected the "sweeping proposition" that "officers may proceed to the back of a home when they do not receive an answer at the front door any time they have a legitimate purpose for approaching the house in the first place." *Id.* at 519-20.

In this case, Carroll cannot avail himself of the "knock and talk" exception to the warrant requirement because he entered the back of the Carmans' property without approaching the front door first. Carroll contends that the layout of the Carmans' property "made the back door the most expedient and direct access to the house from where the troopers had to park." Carroll Br. at 18. While it may have been more convenient for the troopers to cut through the backyard and knock on the back door, the Fourth Amendment is not grounded in expediency. The "knock and talk" exception requires that police officers begin their encounter at the front door, where they have an implied invitation to go. This exception does not license officers to bypass the front door and enter other parts of the curtilage based on where they park their cars. Because Carroll did not knock on the Carmans' front door, but instead proceeded directly through the back of their property, his intrusion cannot be justified as a "knock and talk." Accordingly, Carroll's warrantless entry into the Carmans' curtilage violated the Fourth Amendment as a matter of law.

## C.

Under the qualified immunity doctrine, government

12

officials are shielded from civil liability for conduct that does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982)). Therefore, in determining whether Carroll is entitled to qualified immunity for violating the Carmans' Fourth Amendment rights, we must decide whether these rights were "clearly established at the time of [Carroll's] alleged misconduct. Qualified immunity is applicable unless [his] conduct violated a clearly established constitutional right." *See id.* at 232 (internal citations and quotation marks omitted).

"An individual's Fourth Amendment interest in the curtilage of his home has been well settled for over a century." *Marasco*, 318 F.3d at 521 n.13. Over a decade ago, in *Marasco*, we made clear that an officer's right to knock at the front door while conducting a "knock and talk" does not carry a concomitant right to enter other parts of the curtilage. We established that "entry into the curtilage *after not receiving an answer at the front door* might be" justified under the "knock and talk" exception in limited situations. *Id.* at 520 (emphasis added). Because Carroll bypassed the front door completely, he exceeded the boundaries of the "knock and talk" exception. Based on *Marasco*, which pre-dated Carroll's conduct, it was clearly established that the trooper's warrantless entry into the Carmans' curtilage violated their Fourth Amendment rights.

Therefore, we reverse the District Court's denial of the Carmans' motion for judgment as a matter of law with respect

13

to their unlawful entry claim.[7]

**D.**

We next address Andrew Carman's unreasonable seizure claim. It is undisputed that Carroll seized Carman when he grabbed Carman's arm. Thus, the relevant question is whether there was a "minimum quantum of evidence from which the jury could have rationally reached [its] verdict" that the seizure was reasonable. *See Dutton v. Wolpoff & Abramson*, 5 F.3d 649, 653 (3d Cir. 1993) (internal quotation marks omitted).

"[S]ubject only to a few well-defined exceptions, warrantless . . . seizures are *per se* unreasonable under the Fourth Amendment." *United States v. Williams*, 413 F.3d 347, 351 (3d Cir. 2005) (citing *United States v. Ross*, 466 U.S. 798, 824-25 (1982)). However, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Id.* (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000)) (internal quotation marks omitted); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."). This right to conduct an

---

[7] Because we hold that Carroll's warrantless entry violated the Fourth Amendment, entitling the Carmans to judgment as a matter of law, we do not address the Carmans' challenge to the District Court's jury instructions.

"investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Based on the facts presented at trial, there was a "minimum quantum of evidence" from which a jury could rationally conclude that Carroll's conduct was reasonable. Carroll testified that he was unsure of Carman's identity at the time, did not know whether he was dealing with Zita, and did not know why this unidentified man approached him and Roberts with such hostility. Thus, a jury could rationally find that Carroll had reasonable suspicion to momentarily question Carman to ascertain his identity. Moreover, based on Carroll's testimony that he thought Carman might be an armed car thief and feared that the man was reaching for a weapon, a jury could rationally find that Carroll was justified in momentarily grabbing Carman's arm to effectuate a stop. Because the facts provide a minimum amount of evidence to support the jury's finding that Carroll acted reasonably, we affirm the jury verdict on the unreasonable seizure claim.

## III.

For the foregoing reasons, we affirm in part and reverse in part the judgment of the District Court. As to the unlawful entry claim, we reverse the District Court's denial of the Carmans' motion for judgment as a matter of law. We remand the case with the direction that judgment be entered in the Carmans' favor and that a new trial be ordered with respect to damages. As to the unreasonable seizure claim, we affirm the jury verdict and the District Court's denial of judgment as a matter of law.

15

**EXHIBITS TO OPINION**



PLAINTIFF'S
EXHIBIT

18

PENGAD 800-631-6989



PLAINTIFF'S
EXHIBIT
21

PENGAD 800-631-6989



PLAINTIFF'S
EXHIBIT
22

PENGAD 800-631-6989



PLAINTIFF'S
EXHIBIT
25

PENGAD 800-631-6989



**PLAINTIFF'S EXHIBIT**

26

PENGAD 800-631-6989